## 40337. WHITTINGTON v. THE STATE.

HILL, Chief Justice.
Teresa Faye Whittington was found guilty of murdering Cheryl Marie Soto and was sentenced to death.[1] She brings this appeal. This case was tried and is reviewed under the Unified Appeal Procedure.

The evidence presented was sufficient to allow the jury to find the facts which follow. Teresa Whittington graduated from Madison County High School in May 1981, and began working at a Starvin' Marvin store in Athens, Georgia, in August where she met Richard ("Rick") Soto during the first part of October 1981. She recounted her relationship with him and the January 26, 1982, murder itself in her statement, which was admitted at trial, as follows:

"I have known Rick Soto since sometime the first part of October, 1981. He came into the Starvin' Marvin Store on Highway 72 where I worked. We talked to each other a couple of times and Rick

---

[1] The death sentence was imposed by the jury on May 7, 1982, and a motion for new trial was duly filed. The transcript of evidence was filed on July 2, 1982. The motion for new trial was heard on February 14, 1983, and was overruled on July 1, 1983. Notice of appeal was filed in the trial court on July 28, 1983. Briefs were filed and the case was argued in this court on November 14, 1983.

asked me out. At the time, I didn't know he was married at the time. We started dating and one time I called his house and a girl answered. I asked him later who the girl was and he said it was a girl he had dated. About two days before Thanksgiving, 1981, Cheryl called me at the Starvin' Marvin Store and asked me if I had been seeing Rick. I asked her what business it was of hers, and she told me that she was married to him. That night, I got my mother to drive me over to Rick's house. Mama stayed in the car and I went in the house. Cheryl and Rick were there. Cheryl and I talked and she told him that he would have to make a choice between us. He told her that he would have to think about what he was going to do, and they started arguing. Mama came to the door then and said she had to go home, so I left. Right after that, Rick said he was going to get a divorce. Then he said he couldn't, because her family was worth money, that her grandmother had a lot of money and there was a lot of insurance on Cheryl. He said that he was going to try and work it out. He told me that he married Cheryl for the money. About a week or two later, Rick started talking about getting rid of Cheryl. He talked about throwing the radio in the tub when she was taking a bath. He asked me if I would get rid of Cheryl and make it look like an accident. Before we talked about this, Cheryl had left Rick and gone home to live with her parents. This was in January, 1982. She went to her parents on a Monday. We went out on Friday and he told me he was going to call her and ask her to come home. He said he was going to do this so her parents would think they were back together. We continued to see each other after she came back. We saw each other two or three times. Monday, January 25th, 1982 Rick called me and told me that the neighbors weren't at home. He had said before that he would have to do it when the neighbors weren't at home. He came and picked me up. We went and got some gas and we came home and sat in the driveway and talked. Rick was supposed to call me on Tuesday and when he didn't call, I called him at work. On Monday when we were sitting in the car we talked about killing Cheryl. Rick said I would have to be the one that did it. He said that if I loved him, I would do it. That same day, he had showed me how to shoot the gun. He told me he didn't know if he could pull the trigger. That was why I had to do it. On Tuesday, he came and picked me up and told me the neighbors were gone. He was just sitting in the car grinning at me. The plan was that he was going into the house and act like they had made up and ask her to take a bath with him. When we got to the house, he went in and then he came back out and told me that everything was set. He grabbed me and kissed me. I took the gun off the console between the bucket seats and went into the house. When I went into the house, Cheryl was in the tub. Rick also had told me to knock the radio into the tub to make it look like an accident. I

was standing in the door and she looked at me and I shot her. She was standing in the tub and she fell up against the wall. I ran out and went to the car. I had left the house door open and I could hear Cheryl making a noise in the house. Rick asked me if she was dead. I said I don't know. He told me to get back in there and get it over with. I went back in the house. I went to the bathroom and saw that she wasn't in there. I saw the blood and followed it into the living room. She was standing in the living room. She looked at me and kept saying, 'Please don't, Teresa. You know you're not doing right.' She kept asking me why. I raised the gun and shot her again. She fell on either her side or her front. I think it was her side. I went back to the car. Rick had locked Gypsy [his dog] in the pickup truck. Rick asked me if I was okay. I said I was scared and he told me not to worry. We left then. I laid the gun between the seats. Rick was taking me home. We stopped on the Diamond Hill Road, the road I live on, and Rick took the bullets out of the gun and handed them to me. I threw one out. Then he drove up a little and I threw another out. There were only two. Rick then drove me to Quality Grocery. I called Donna at work and she wasn't there. I then called her house and talked to Donna's mother. Then I called home and told Mama I was going to Donna's. I walked over to Donna's. Before Rick left the grocery, he told me he was going to go check on Cheryl to make sure. He told me he would call me. He called me at Donna's about 15 minutes after I got there. He asked me how I was doing. I asked him if he had been to the house and he said yes. I asked if she was dead and he said no. He said he'd wait about an hour and check on her again. He said it was just a matter of time before it was over with. He said he would fix the house so it would look like someone had broken in. He asked me if there was anything he had forgotten. I told him to mess up the house real good. He said as soon as he got through, he'd call me. I told him to get rid of the radio. He had told me to push the radio into the tub and if that didn't work, to shoot her. When I pushed the radio, it came unplugged. This is a true statement. I have read all seven pages and it is the truth."[2]

Other evidence established that Richard Soto had purchased the murder weapon on July 3, 1981, and eleven days later obtained a $50,000 term life insurance policy on his wife, some three months before he met the defendant. An insurance agent testified that he visited their home and wrote the policy with both of the Sotos present. The policy contained a double indemnity clause which provided that it would pay $100,000 in the event that Cheryl Soto died an accidental death.

---

[2] The defendant's confession was admissible in evidence. See Division 6, below.

A co-worker of Soto's testified that Cheryl Soto worked at the same location, albeit on an irregular schedule. Rick and Cheryl kept a radio at their work bench. On the morning of January 26, 1982, he saw Rick leave with the radio and return in less than five minutes empty handed. He identified the radio which was found in the bathtub after Cheryl Soto's murder as the same radio which Rick had removed from his work bench that morning. He also testified that Soto had left work sometime between 1:30 and 2:30 p.m. on January 26, 1982, and that at about 3:00 p.m. he saw Soto driving his car, with a female passenger, toward his home. He further testified that Soto returned and worked from approximately 4:00 to 5:00 p.m.

One of the Sotos' neighbors testified that Richard Soto came to her home at approximately 5:00 p.m. and asked her to call the police and get an ambulance because Cheryl had been shot. She did so. Sheriff Jack Fortson and Deputy Morgan both arrived at the Soto home at 5:08. They entered the kitchen where they saw blood on the kitchen floor; they then saw Cheryl Soto's naked body on the living room floor. GBI special agent Harold Cook arrived at 5:40 p.m. He examined the body at about 5:50 p.m. and estimated that Cheryl Soto had been dead 1 to 2 hours. Her body was covered with blood and she appeared to have suffered two wounds, one in her neck and one in her head. There was water in the tub and a radio in the bath water.

The pathologist who conducted the autopsy testified that the victim sustained a relatively minor gunshot wound in her neck as well as a gunshot wound in her forehead. Both wounds bled, indicating that the victim was alive when both shots were fired. There was gunpowder around the forehead wound. The pathologist also testified that the victim was approximately three months pregnant. The victim's father testified that she and Rick had told her parents of her pregnancy at Christmas. There was no direct evidence that the defendant was aware that the victim was pregnant.

One of the defendant's friends, Donna Metheny, testified for the state that the defendant had asked her in December whether she thought Donna's boyfriend, Travis, would kill anyone for $10,000. The defendant had also told her that Rick wanted to get his wife used to taking a bath with a radio next to the tub so that he could knock the radio into the water and kill her. On cross-examination she testified that she did not remember when it was the defendant had asked her whether Travis would murder someone for $10,000 and that she thought the defendant was joking about it.

According to the defendant's statement, she went to the Methenys' home after shooting Cheryl Soto. Donna Metheny testified that Teresa was there when she arrived home at ap-

proximately 2:30 p.m., and that she was very quiet and mopey.

On Wednesday, January 27, 1982, the day after the murder, Sheriff Fortson and GBI Special Agent Mary Ann Jenkins went to the defendant's home at about 3:00 p.m. The defendant, her mother, and a small child were there. With her mother present, and after being advised of her rights by Agent Jenkins, the defendant made an oral statement which was admitted into evidence. She stated that she had met Rick Soto in November of 1981 and split up with him in December but that he kept calling her once or twice a week; that Rick had picked her up the day before between 1:00 and 1:30 p.m. and they had driven up to the cemetery to talk; that he had brought her back to the Quality Grocery Store in Colbert about 2:00 p.m.; that she had called Donna Metheny's home and job and her own mother; that she had walked to Donna's home and spent the night there; and that she did not know anything about the death of Cheryl Soto and was willing to take a polygraph test. Agent Mary Ann Jenkins took notes during the statement and made a summary which formed the basis of her testimony at trial.

Having gotten this statement, Sheriff Fortson and Agent Jenkins proceeded to Donna Metheny's home. As they left the Metheny home, they received a call on the radio advising them that the defendant's mother had requested that they return to her home, which they did. The mother met them at the door and told them that Teresa wanted to tell them something. Agent Jenkins again advised the defendant of her rights, and asked if they could go to the GBI office. At GBI headquarters, Agent Jenkins again read the defendant her rights. The defendant executed a waiver certificate which her mother witnessed. The defendant then made and signed the confession quoted above. That same day, a Madison County Deputy Sheriff who was in the room at GBI headquarters with Rick Soto and the defendant heard her tell Soto, "You was supposed to make it look like a robbery and throw the gun in the river" and "You didn't make me do it. I pulled the trigger twice."

The evidence was sufficient to authorize the jury to find the defendant guilty of murder beyond a reasonable doubt. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

1. The defendant assigns error upon the trial judge's addressing certain questions to the prospective jurors en masse. Under Georgia law in all criminal cases the state and the defendant have the right to an individual examination of each prospective juror "after the usual voir dire questions have been put by the court." OCGA § 15-12-133 (Code Ann. § 59-705). The "usual voir dire questions" are the questions recited in OCGA § 15-12-164 (Code Ann. § 59-806). *Jordan v. State,* 247 Ga. 328, 339 (276 SE2d 224) (1981). OCGA § 15-12-164

(Code Ann. § 59-806) requires that the jurors be asked (a) whether they have formed and expressed any opinion as to the guilt or innocence of the accused; (b) whether they have any prejudice or bias for or against the accused; (c) whether their minds are perfectly impartial between the state and the accused; and (d) in death penalty cases, whether they are conscientiously opposed to capital punishment. In this case the trial court asked the first three questions, as well as a question regarding relationship (OCGA § 15-12-135 (Code Ann. § 59-716)), of the jurors en masse. The defendant raised no objection. The fourth question, relating to capital punishment, was asked of each juror during individual voir dire.

The defendant complains that the trial court erred in addressing the first three questions described above to the jury en masse. She relies on McCorquodale v. Balkcom, 705 F2d 1553, 1556-60 (11th Cir. 1983), where a panel of the Eleventh Circuit held that it is error to pose Witherspoon questions (Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968)) to prospective members of the jury en masse. Upon hearing the case en banc, the Eleventh Circuit reversed the panel and ruled that the method of voir dire did not violate Witherspoon. McCorquodale v. Balkcom, supra. In addition, McCorquodale dealt exclusively with Witherspoon questions while we deal exclusively with non-Witherspoon questions. It is all but certain that if Witherspoon questions may be asked en masse, a fortiori the questions at issue here may be asked en masse. No case requiring such individual voir dire as a matter of constitutional law has been cited, and OCGA § 15-12-133 (Code Ann. § 59-705) contemplates that such questions may be addressed en masse. Therefore this enumeration of error is without merit.

2. OCGA § 15-12-4 (Code Ann. § 59-114) provides that a person who has served on a grand or traverse jury shall not serve as a juror in the succeeding term of court. In this case, when individual voir dire commenced, the trial judge asked the second juror questioned, "Did you serve as a member of the grand jury or traverse jury last term of court?" After the juror answered in the negative, the judge remarked, "I don't think I asked that question and I want to ask each one of them that question." Defendant now complains that the failure to so qualify the first juror is reversible error. We find, however, that any error was waived by the defendant's failure to object.

This instance is a particularly appropriate one in which to find waiver. The record is clear that the defendant's attorney was aware of the alleged error she now asserts, and had her attorney complained at that time, the first juror could easily have been questioned further and the matter clarified. Additionally, the defendant offered no

evidence that the juror in question had served during the previous term.[3]

3. The defendant enumerates as error that, by allowing the state 11 peremptory challenges, the trial court violated the proportionality established by OCGA § 15-12-165 (Code Ann. § 59-805), which allows the state only 10 peremptory challenges to the defendant's 20 challenges.

Under OCGA § 15-12-165 (Code Ann. § 59-805), a defendant subject to imprisonment for not less than four years is entitled to 20 peremptory strikes, and the state is entitled to half as many. In this case, however, immediately before the jury was struck the trial court announced that it was allowing the defendant two extra strikes, and the state one extra strike, because four extra jurors had been qualified in order to obtain one alternate. That is, forty-six jurors were qualified to obtain thirteen. The defendant was given 22 strikes and the state was given 11; thus, contrary to the defendant's argument, proportionality was preserved. The state, however, exercised its eleventh strike before the first twelve jurors were selected. The defendant did not object. While we agree with the defendant that the law anticipates that the extra strikes be reserved until the alternates are being selected, OCGA § 15-12-169 (Code Ann. § 59-902), we do not agree with the defendant that, absent objection, the failure to do so is reversible error in view of our disposition of this case. As was said in North Carolina v. Woods, 286 NC 612 (213 SE2d 214, 220) (1975), death penalty vacated on other grounds, 428 U. S. 903 (1976): "It is well established that the system by which juries are selected does not include the right of any party to select certain jurors but to permit parties to protect themselves against prejudice by allowing them to exclude unacceptable jurors. Defendant has no vested right to a particular juror." Accord Tennessee v. Wingard, 480 SW2d 915 (Tenn. 1972).

4. Defendant complains that three color photographs of the victim's body, showing how it appeared when law enforcement officials arrived at her home, were repetitious and prejudicial. The pictures admitted are not repetitious and were relevant. The trial court did not err in admitting them. Ramey v. State, 250 Ga. 455, 456 (298 SE2d 503) (1983).

5. The defendant enumerates as error the admission into evidence of the insurance policy on the victim because the defendant was not a beneficiary thereon (Richard Soto was the beneficiary) and

---

[3] We note, in this connection, that he was not one of the grand jurors who signed the indictment.

because, she alleges, the state produced no evidence that she had any interest in the policy so that it was irrelevant. She further argues that if it were relevant it would be because she was part of a conspiracy to obtain money, and in that event the trial court erred in not charging on conspiracy even though she did not request such a charge.

We find no merit in these enumerations. The defendant confessed to murdering Cheryl Soto because Rick Soto wanted her to, and the jury was authorized to find that Soto wanted Cheryl murdered so that he could collect insurance money. Thus the policy was related, at least indirectly, to the defendant's motive. The policy was relevant and the trial court did not err in admitting it into evidence. *Johnson v. State,* 186 Ga. 324 (3) (197 SE 786) (1938).

*Roger v. State,* 224 Ga. 436 (2) (162 SE2d 411) (1968), upon which the defendant relies, is inapposite. There the victim was apparently the defendant's wife's lover. The victim's will and insurance policy both named the defendant's wife as beneficiary. But because there was no evidence that the defendant knew that his wife would benefit from the victim's death, this court held that it was error to admit the victim's will and insurance policy to show motive. Here, in stark contrast, the defendant stated that Soto told her that he married the victim for money, that he therefore could not divorce her, that she should be killed so as to make it appear to be an accident, and that "there was a lot of insurance" on her. Unlike *Roger v. State,* supra, the defendant here knew of the existence of insurance.

Nor did the trial court err in not charging on conspiracy. The purpose of such a charge would be to make the defendant responsible for some act or statement of the other conspirator and such charge was not applicable under the facts of this case.

6. The defendant argues that the trial court erred in admitting her confession over the objection that it was involuntary. Having examined the transcript of the Jackson-Denno hearing (Jackson v. Denno, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964)), we conclude that the trial court's finding that there is no evidence to support a contention that the confession was involuntary is amply supported by the record. *Gates v. State,* 244 Ga. 587, 590-591 (261 SE2d 349) (1979), cert. denied, 445 U. S. 938 (1980). As recited in the facts, it is undisputed that the defendant received Miranda warnings and executed a written waiver witnessed by her mother. The interrogation which resulted in a handwritten 7 page confession lasted 2 1/2 hours; the defendant's mother was with her more than half of that time.[4]

---

[4] At the defendant's request, the confession was written by GBI Agent Jenkins.

The defendant argues that two factors show her confession to have been involuntary: (1) GBI Agent Jenkins testified that when she talked to the defendant at her home during the first visit the agent told her, "[t]his was a horrible thing that had happened. That if she knew anything about it, she needed to tell us about it. That, you know, if she knew anything, we needed to know about it. . . ."; and (2) that the defendant did not say she pulled the trigger until, sometime during interrogation, she was told that Rick had said that he did not pull the trigger. We disagree. The fact that the officer said that the defendant "needed" to tell the officers if she knew anything about the murder does not render the confession involuntary. OCGA § 24-3-50 (Code Ann. § 38-411). The fact that one party to the commission of a crime has confessed to his participation in it does not render the defendant's later confession involuntary.

7. The defendant contends that the trial court's instructions to the jury were erroneous. First, the defendant argues that the trial court erred in not instructing the jury on the law of circumstantial evidence. See OCGA § 24-4-6 (Code Ann. § 38-109); *Mitchell v. State,* 18 Ga. App. 501 (4) (89 SE 602) (1916). She did not request such a charge, but she argues that it was error for the trial court not to give it because the only direct evidence was the defendant's confession and the trial court instructed the jury that they must disregard it unless they found that she had been warned of her constitutional rights and knowingly waived them and that the statement was voluntarily and freely given. Thus, she argues, if the jury were to disregard her confession, they would have only circumstantial evidence before them and would be unguided as to how such evidence should be considered.

The general rule is that where the state relies solely on circumstantial evidence, it is reversible error to fail to charge on circumstantial evidence; however it is not error to fail to charge on circumstantial evidence where there is some direct evidence. *Johnson v. State,* 235 Ga. 486, 491-92 (220 SE2d 448) (1975). But if the only direct evidence comes from a witness who has been impeached, it is reversible error to fail to charge on circumstantial evidence *upon request. Stanley v. State,* 239 Ga. 260, 261 (236 SE2d 611) (1977). We find it unnecessary to decide if this latter rule applies as well where the only direct evidence is a confession (assuming, arguendo, that that is the only direct evidence in this case), because here the facts

---

The defendant signed and initialed the beginning and end of each page, and signed the confession at the end.

demonstrating the admissibility of defendant's confession were not contested at trial and there was no request. We hold that where a confession is admitted into evidence following a Jackson v. Denno determination and the jury is charged as to its authority to exclude it from consideration, it is not error for the trial court to fail to charge on circumstantial evidence absent a proper request.

8. The court instructed the jury in part as follows: "I give you certain presumptions of law that are applicable to this case. A presumption is a conclusion which the law draws from given facts. Each of these presumptions are rebuttable; that is, they are subject to being overcome by evidence to the contrary. They are: every person is presumed to be of sound mind and discretion, but this presumption may be rebutted. A person will not be presumed to act with criminal intention, but the trier of facts — and that is you, ladies and gentlemen of the jury — may so find if the facts so presented to you indicate.

"I charge you, ladies and gentlemen, as to the definition of intent. I charge you that intent to commit the crime as charged in this indictment is an essential element that the State must prove beyond a reasonable doubt, intent being always a question for the jury and it is ordinarily ascertained by the acts and conduct. Intent may be shown in many ways, provided the jury finds that it existed from the evidence produced before them. It may be inferred from proven circumstances or by acts and conduct, or it may be presumed when it is the natural and necessary consequences of an act. I charge you again that this may be rebutted. It is a rebuttable presumption.

"I charge you that intent is an essential element of any crime and must be proved by the State beyond a reasonable doubt. I charge you that a person will not be presumed to act with criminal intent, but the trier of facts, as I have stated — and that is you, ladies and gentlemen of the jury — may find such intention or the absence thereof upon the consideration of words, conduct, demeanor, motive, and other circumstances connected with the act for which the accused is being prosecuted."

The defendant contends that the giving of a portion of the foregoing charge violates Sandstrom v. Montana, 442 U. S. 510 (99 SC 2450, 61 LE2d 39) (1979). The portion challenged by the defendant is as follows: "It may be inferred from proven circumstances or by acts and conduct, or it may be *presumed* when it is the natural and necessary consequences of an act." This charge "leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof. . . ." Ulster County Court v. Allen, 442 U. S. 140, 157 (99 SC 2213, 60 LE2d 777) (1979). We find no error and we note that a charge identical for all practical purposes to this charge was upheld in Lamb

v. Jernigan, 683 F2d 1332, 1338-1340 (11th Cir. 1982). We find no error here.

## *Sentence Review*

9. The jury found two statutory aggravating circumstances: "1. The offense of murder was outrageously and wantonly vile, horrible and inhuman in that it involved torture to the victim or depravity of mind on the part of the defendant. [OCGA § 17-10-30 (b)(7) (Code Ann. § 27-2534.1).] 2. The offender caused, or directed another to commit murder, or committed murder as an agent or employee of another person." (OCGA § 17-10-30 (b)(6) (Code Ann. § 27-2534.1).)[5] The defendant contends that the evidence was insufficient to support either finding. We will address these aggravating circumstances in reverse order.

(a) Richard Soto received a life sentence after the jury deadlocked 7 to 5 on imposing the death penalty. See *Soto v. State,* 252 Ga. 164 (—— SE2d ——) (1984). Without deciding whether Soto could have been sentenced to death as the offender who caused or directed another to commit murder, we find that this defendant did not commit murder as an agent or employee of another within the meaning of subsection (b)(6) of OCGA § 17-10-30 (Code Ann. § 27-2534.1), supra. There was no evidence that this defendant was Soto's employee. Although both were parties to the crime, OCGA § 16-2-20 (Code Ann. § 26-801), and although the defendant was motivated by Soto, she was not acting as Soto's "agent" as intended by this aggravating circumstance; i.e., the defendant was not hired by Soto. See *Castell v. State,* 250 Ga. 776, 794 (301 SE2d 234) (1983). Therefore, the penalty of death cannot be upheld on this aggravating circumstance.

(b) The jury found the first component and two parts of the second component of the § (b)(7) statutory aggravating circumstance; i.e., torture and depravity of mind. See *Hance v. State,* 245 Ga. 856 (3) (268 SE2d 339), cert. denied, 449 U. S. 1067 (1980).

"Torture may be found where the victim is subjected to serious physical, sexual, or psychological abuse before death. *Hance v. State,* supra. Depravity of mind may be found where the victim is subjected to serious psychological abuse before death, or to mutilation, serious disfigurement, or sexual abuse after death. Ibid." *Phillips v. State,* 250 Ga. 336, 340 (297 SE2d 217) (1982).

Here, as in *Phillips v. State,* supra, it is undisputed that there

---

[5] OCGA § 17-10-30 (b)(7) (Code Ann. § 27-2534.1) includes aggravated battery but that portion of the statute was not charged.

was no sexual abuse and that the victim died after the defendant left. Thus, the jury's finding of torture and depravity of mind must rest upon serious physical or psychological abuse before death.

It is clear from the evidence that the defendant entered the Soto home with the intent to murder Cheryl Soto. The fact of premeditated murder, standing alone, however, is insufficient to justify the imposition of the death penalty under our death penalty law. Instead, the death sentence must be supported by at least one statutory aggravating circumstance. OCGA § 17-10-30 (c) (Code Ann. § 27-2534.1).

Pain and suffering is an inevitable by-product of any murder. What § (b)(7) condemns is the "unnecessary and wanton infliction of pain or suffering," aside from that resulting as a matter of course from the commission of any murder. *Phillips v. State,* supra, 250 Ga. at 339. A finding of serious physical or psychological abuse requires a showing that the defendant "inflicted deliberate, offensive and prolonged pain on his victim prior to death." Id. at 341. That is to say, in order for there to be torture, there must be evidence that the torture was deliberate; i.e., the torture was intentional, not merely that the victim in fact suffered prolonged pain prior to death. There is no evidence here that the defendant intended to inflict the pain and anguish that the victim undoubtedly suffered.

Depravity of mind is shown by an utterly corrupt, perverted or immoral state of mind. *West v. State,* Appendix 252 Ga. 156, 161 (—— SE2d ——) (1984). The 19-year-old defendant here had never been in any previous trouble, and had been shown the day before how to fire the gun Soto had purchased earlier, and was motivated by Soto who testified at his trial and convinced at least five jurors that he should not be put to death. Shortly after being questioned, the defendant made a complete confession accepting responsibility for the crime. The evidence does not show that depravity of mind required by § (b)(7).

For the heinous and unnecessary offense of murder, Teresa Whittington must be punished. We cannot agree, however, that this murder, in comparison with other murders in which a life sentence was imposed, involved such torture and depravity of mind as warrants the penalty of death.

Because the evidence does not support the aggravating circumstances found, the death sentence imposed in this case must be set aside. We therefore do not reach the remaining enumerations of error which are directed to the penalty.

*Conviction affirmed. All the Justices concur. Penalty reversed. All the Justices concur, except Marshall, P. J., Weltner and Bell, JJ., who dissent.*

DECIDED FEBRUARY 15, 1984 —
REHEARINGS DENIED FEBRUARY 28, 1984 AND MARCH 6, 1984.

*Cook, Noell, Tolley & Aldridge, Edward D. Tolley, Floyd W. Keeble, Jr.,* for appellant.

*Lindsey A. Tise, Jr., District Attorney, Michael J. Bowers, Attorney General,* for appellee.

MARSHALL, Presiding Justice, dissenting.

I concur in Justice Weltner's dissent as to Division 9 of the majority opinion and to that portion of the judgment vacating the sentence of death. His dissent was to the majority's reversal of the jury's verdict in the sentencing phase as to the aggravating circumstance set forth in OCGA § 17-10-30 (b)(6) (Code Ann. § 27-2534.1).

In addition, I dissent to the majority's reversal of the jury's verdict in the sentencing phase as to the aggravating circumstance set forth in OCGA § 17-10-30 (b)(7) (Code Ann. § 27-2534.1): "(b) In all cases of other offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating circumstances which may be supported by the evidence: . . . (7) The offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim;". In my opinion the evidence amply authorized the jury to find torture and depravity of mind on the part of the appellant. The attempt to murder by the radio set, the first attempt at shooting, the return to the scene to ensure death, the rejection of the victim's pleas for mercy, the second shooting, and, finally, the routine inquiry of Soto as to the death of the victim, all combine to constitute torture and demonstrate depravity of mind.

I do not agree that we should seek to evaluate torture, relative to this aggravating circumstance, subjectively. It is, or is not, torture, when viewed objectively as to what is done to the victim to cause the victim to suffer mentally and physically.

I respectfully dissent.

I am authorized to state that Justice Weltner and Justice Bell join in this dissent.

WELTNER, Justice, dissenting.

I dissent to Division 9 of the majority opinion, and to that

portion of the judgment vacating the sentence of death.

The majority states: "Although both were parties to the crime, OCGA § 16-2-20 (Code Ann. § 26-801), and although the defendant was motivated by Soto, she was not acting as Soto's 'agent' as intended by this aggravating circumstance; i.e., the defendant was not hired by Soto. See *Castell v. State,* 250 Ga. 776, 794 (301 SE2d 234) (1983). Therefore, the penalty of death cannot be upheld on this aggravating circumstance." (Opinion, p. 178)

I respectfully suggest that *Castell* properly must be understood as the converse of the proposition for which it is cited by the majority. "We hold that the terms 'agent' and 'employee,' as used in OCGA § 17-10-30 (b)(6) (Code Ann. § 27-2534.1) . . . should be given their common, everyday meanings: An employee is one who is hired by another and an agent is one who acts for another." 250 Ga. at 794.

The factual recitation contained in the majority opinion leads, inevitably, I believe, to the conclusion that Whittington was at all times material "one who acts for another." She must, therefore, come within the meaning of (b)(6) — unless the agency contemplated therein must be limited solely to acts undertaken on behalf of another for monetary gain. That cannot be, however, in view of the inclusion in the statute of subsection (b)(4), relative to the commission of murder "for the purpose of receiving money or any other thing of monetary value." OCGA § 17-10-30 (b)(4) (Code Ann. § 27-2534.1).

I am authorized to state that Presiding Justice Marshall and Justice Bell join in this dissent.