### 41204. ROSS v. THE STATE.
(326 SE2d 194)

MARSHALL, Presiding Justice.

This is a death penalty case. Eddie Lee Ross was convicted in DeKalb County of murder, rape, burglary, forgery in the first degree, and financial transaction card fraud. He was sentenced to death for the murder. The case is here on direct appeal, for review under the Unified Appeal Procedure (252 Ga. A-13 et seq.), and for the sentence review required by OCGA § 17-10-35.[1]

*Facts*

Shortly before 10:00 a.m. on September 2, 1983, Vivian Turner stopped by the home of her 87-year-old mother, Ellen Funderburg. Upon entering the house, she discovered that the house had been ransacked and she found the partially nude body of her mother lying on the bedroom floor. The handle end of a pair of scissors protruded from the victim's chest.

Later that morning, Eddie Lee Ross was arrested at the South DeKalb Mall after he had used the victim's Rich's credit card to purchase a $170 radio. On his person, officers found a check payable to Ross for $80 which bore a signature ostensibly that of Betty Jean Funderburg (one of the victim's daughters who had been deceased for seven years). Subsequently, other personalized checks, some blank and some filled out, belonging either to Ellen or Betty Jean Funderburg, as well as some of their jewelry, were found in the trunk of Ross's automobile.

---

[1] The jury returned its verdict as to sentence on January 19, 1984. A motion for new trial was filed January 24, 1984; amended April 4, 1984; heard April 6, 1984 and denied that day. A notice of appeal was filed May 1, 1984 and the record was docketed in this court May 30, 1984. The case was orally argued September 11, 1984.

An autopsy of the victim showed that her skull had been fractured by repeated blows from a blunt object (a broken vase was found near the body), she had been stabbed numerous times (at least once in the heart), and deep in her vagina were small tears consistent with forced penetration by a blunt object such as a male sex organ.

After his arrest, Ross was interrogated, and gave three statements, the last of which was introduced at trial. See Division 3, below. In the last statement, Ross recounted the circumstances of the crime as follows: Sometime after 5:30 a.m., Ross pried open a back window of the Funderburg home with a screwdriver, entered the house, and began searching for money. He entered the bedroom to check on the victim, and for some reason began hitting her with a vase. She woke up and screamed, to which he responded by stabbing her with a pair of scissors. She quit screaming. Then he "started to have sex with her." However, he only "juked about one or two times," and quit, because he "realized that wasn't me, you know." Ross got $11 in cash and some credit cards out of the victim's purse, took a wedding ring off the victim's finger, and took some other jewelry and some checks that he found in the house. He pawned one of the rings for $15 and then filled out one of the checks and tried unsuccessfully to cash it at a bank across the street from South DeKalb Mall. Next, he went to the mall and bought the radio, using the victim's credit card. That purchase, Ross recognized with regret, led to his arrest.

The sufficiency of the evidence is not raised on appeal. However, we have reviewed the evidence pursuant to Rule IV (B) (2) of the Unified Appeal Procedure and find it sufficient to support the convictions. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Enumerations of Error*

1. In his first enumeration of error, Ross contends that two prospective jurors were improperly excused under *Witherspoon v. Illinois*, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968). We do not agree. The voir dire testimony of these two jurors clearly shows that they could not vote for the death penalty no matter what the evidence. *Mincey v. State*, 251 Ga. 255 (8) (304 SE2d 882) (1983); *Allen v. State*, 248 Ga. 676 (2) (286 SE2d 3) (1982).

Regarding one of the two jurors, Ross additionally complains that his attempted rehabilitation was prematurely cut off by the court. See *Spivey v. State*, 253 Ga. 187, 197 (n. 3) (319 SE2d 420) (1984). However, we find no reversible error here, inasmuch as the attempt to rehabilitate the prospective juror was limited to whether or not the juror could "consider" the death penalty. "We adhere to our previously stated position that: 'It is not sufficient that the juror be willing to

"consider" the death penalty if he or she is committed to automatically vote against the death penalty after having "considered" it.' *Cofield v. State*, 247 Ga. 98, 103 (2) (274 SE2d 530) (1981)." *Spivey v. State*, supra at 193-194.

2. The second enumeration of error, in which Ross complains of the practice of *Witherspoon*-disqualification of jurors, is without merit. *Mincey v. State*, supra, (2).

3. Soon after his arrest, on September 2, Ross was brought to the DeKalb Police Department headquarters. Police officer Cunningham gave Ross the warnings required by *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), and Ross signed a written waiver form reciting that he understood his *Miranda* rights, waived them, and was willing to make a statement. Officer Cunningham reduced the ensuing statement to writing and the interrogation was temporarily concluded. However, upon talking with his supervisors, Cunningham decided to talk to Ross again in order to obtain from him a more detailed explanation of the events of the crime. Officer Cunningham was joined in this effort by officer Thomas, whom Ross knew from a previous case. The second interrogation followed the first one by approximately 15 minutes and resulted in another statement, again reduced to writing, that was approximately three times as long as the first, and included, at the end, two paragraphs written by Ross himself, in which he swore that the statement was true and stated that he was very sorry and that no one had made him write the note. The interrogation concluded at approximately 5 p.m.

On September 4, Ross was brought before a DeKalb County magistrate for a "first appearance" (see OCGA §§ 17-4-26 and 17-4-62), at which a date was set for his committal hearing (see OCGA §§ 17-7-23 and 17-7-24). Although the usual practice in the DeKalb magistrate court was to hold a committal hearing within seven days of the first appearance, Ross eschewed representation by the public defender and requested additional time so that, with the help of his father, he could retain the services of an attorney of his own choosing. This request was granted, and a committal hearing was set for October 3.

That afternoon, officer Thomas decided that it might be a good idea to talk to Ross one more time and, this time, to tape-record the statement. Ross was willing and, after re-advising Ross of his *Miranda* rights and eliciting from Ross that he understood those rights, Thomas tape-recorded a third statement.

At trial, the admissibility of the confessions was contested, and the court conducted a *Jackson-Denno* hearing outside the presence of the jury. At the conclusion of the hearing, the court ruled that all three were voluntary, but, presented together, would be unduly cumulative. The court offered the state the choice of presenting to the jury only the first two, or only the third. The state chose the latter alter-

native, and, thus, the jury heard only the third, tape-recorded confession.

In his third enumeration of error, Ross contends that the third statement was taken in violation of his Fifth and Sixth Amendment rights to counsel, and should therefore have been suppressed.

(a) In *Miranda v. Arizona*, supra, the United States Supreme Court decided that an accused in police custody has a Fifth Amendment right not to incriminate himself and that to protect this right, any custodial interrogation must be preceded by the now-familiar *Miranda* warnings, which include a right to counsel during the interrogation. See *New York v. Quarles*, __ U. S. __ (104 SC 2626, 2634-35, 81 LE2d 550) (1984) (O'Connor, J., concurring in part and dissenting in part). This *Miranda* right to counsel can be waived; however, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, supra, 384 U. S. at 475.

The determination whether an accused has intentionally relinquished or abandoned a known right or privilege, such as a *Miranda* right to counsel, is determined by reference to " 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' *Johnson v. Zerbst*, 304 U. S. 458, 464 [58 SC 1019, 82 LE 1461]; [cits]." *North Carolina v. Butler*, 441 U. S. 369, 374-375 (99 SC 1755, 60 LE2d 286) (1979). If, however, an accused *asserts* his Fifth Amendment right to counsel, that is, if he "expresse[s] his desire to deal with the police only through counsel, [then he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U. S. 477, 484-485 (101 SC 1880, 68 LE2d 378) (1981).

Ross insists that he invoked his Fifth Amendment right to counsel at his first appearance in the DeKalb magistrate court. As a consequence, Ross argues, since the subsequent interrogation was initiated by the police and not by Ross, the admissibility of the taped statement should have been governed by the "per se" rule established by *Edwards v. Arizona* (see *Solem v. Stumes*, __ U. S. __ (104 SC 1338, 79 LE2d 579) (1984)), rather than by the waiver standard of *North Carolina v. Butler*, supra.

Ross's argument is premised upon an assumption with which we cannot agree, i.e., that Ross asserted his *Miranda* right to counsel or, in other words, "expressed his desire to deal with the police only through counsel."

It is no doubt true that an accused has no affirmative obligation to state precisely why he wants a lawyer (see *Johnson v. Virginia*, 454

U. S. 920 (102 SC 422, 70 LE2d 231) (1981) (Marshall, J., dissenting from the denial of certiorari)), but if he does, "surely from the circumstances of such a request we can find guidance as to the accused's state of mind, which is the key voluntariness inquiry." *Collins v. Francis*, 728 F2d 1322, 1333-34 (11th Cir. 1984). Ross volunteered two statements prior to his first appearance and one after. At no time during police interrogation did he express any desire to deal with police only through counsel or request that interrogation cease for any reason. Nor did he do so at his first appearance. Instead, he announced only his intention to retain the services of an attorney to represent him at his committal hearing. In these circumstances, we do not find *Edwards v. Arizona* to be applicable.

Of course, an accused does not waive his Fifth Amendment right to counsel merely by his failure to assert it. However, in the absence of such an affirmative assertion, the *North Carolina v. Butler* standard of waiver applies, rather than the per se rule of *Edwards v. Arizona*.

We find that Ross waived his Fifth Amendment right to an attorney when he was interrogated on September 4 and, therefore, find that the admission in evidence of the resulting taped confession was not Fifth Amendment error.

(b) Alternatively, Ross contends that his first appearance in the DeKalb magistrate court was the kind of judicial proceeding that triggered his Sixth Amendment right to counsel and that a stricter standard of waiver applies to the Sixth Amendment right to counsel than to the Fifth Amendment right to counsel. See *Massiah v. United States*, 377 U. S. 201 (84 SC 1199, 12 LE2d 246) (1964); *Brewer v. Williams*, 430 U. S. 387 (97 SC 1232, 51 LE2d 424) (1977).

We need not determine whether or to what extent the Sixth Amendment waiver standard is stricter than that of the Fifth Amendment, which in any event appears to be an unsettled question,[2] because we conclude that Ross's first appearance was not an adversary judicial proceeding.

That a Sixth Amendment right to counsel protects a defendant even in extrajudicial confrontations between government agents and the accused, was established in *Massiah v. United States*, supra.[3]

---

[2] Compare, e.g., *United States v. Mohabir*, 624 F2d 1140, 1147 (2nd Cir. 1980); *United States v. Shaw*, 701 F2d 367, 380 (5th Cir. 1983); *Fields v. Wyrick*, 706 F2d 879, 880-881 (8th Cir. 1983); *United States v. Clements*, 713 F2d 1030, 1034-1035 (4th Cir. 1983). See also Kamisar, Brewer v. Williams, Massiah and Miranda: What is Interrogation? When Does it Matter? 67 Geo. L.J. 1, 30: "It may be that the [*Brewer v.*] *Williams* Court did operate on the premise that a *heavier* burden rests on the government to establish a waiver of a '*Massiah* right to counsel' than a waiver of *Miranda* rights, but it never said so."

[3] Massiah's Sixth Amendment right to counsel was held to have been violated when, after his indictment and release on bail, incriminating statements were elicited from him by a

Moreover, while *Massiah* itself might reasonably support a conclusion that the Sixth Amendment's right to counsel attaches only after an indictment (see *Drake v. State*, 245 Ga. 798 (1) (267 SE2d 237) (1980)), subsequent cases clearly establish that the *Massiah* right to counsel attaches "at or after the initiation of adversary judicial proceedings against the defendant," *United States v. Gouveia*, ___ U. S. ___ (104 SC 2292, 2297, 81 LE2d 146) (1984) (quoting *Kirby v. Illinois*, 406 U. S. 682, 688 (92 SC 1877, 32 LE2d 411) (1972)) (plurality opinion); " 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " *Brewer v. Williams*, supra, 430 U. S. at 398 (also quoting *Kirby v. Illinois*, supra.)

However, the Sixth Amendment right to counsel clearly does not attach simply because the accused is in custody, or has been arrested. *United States v. Gouveia*, supra, 104 SC at 2299. Rather, the Sixth Amendment right to counsel exists to protect the accused "during trial-type confrontations with the prosecutor" and thereafter. Ibid. Ross's first appearance was not such a confrontation.[4] There was no prosecutor there, and no issues to resolve except to set a date for such a confrontation, at which time Ross *would* be represented by an attorney, and to determine if Ross needed the court to appoint an attorney (he did not).[5] Thus, the September 4 interrogation was not an abridgment of Ross's Sixth Amendment right to counsel, because that right had not yet attached.

Since no Fifth or Sixth Amendment error occurred, Ross's third enumeration of error is without merit.

4. During the *Jackson-Denno* hearing, three inmates testified for Ross that, when he was brought to his cell following the first two interrogations, he had visible bumps and bruises on his head. One of the three, Michael Butler, was called the next day by Ross to testify before the jury. On direct examination, he essentially repeated his *Jackson-Denno* testimony. On cross-examination, the state asked Butler if he knew more about the case than he was willing to admit.

---

co-defendant who, unbeknownst to Massiah, was an undercover agent wired for sound.

In contrast to the *Miranda* right to counsel, which attaches only if an accused is in police custody and subjected to police interrogation or its functional equivalent (*Rhode Island v. Innis*, 446 U. S. 291 (100 SC 1682, 64 LE2d 297) (1980)), the *Massiah* right to counsel attaches once adversary judicial proceedings have commenced against the accused, whether or not he is in custody or is subjected to a police interrogation. *Brewer v. Williams*, supra; *Massiah v. United States*, supra; *McLeod v. Ohio*, 381 U. S. 356 (85 SC 1556, 14 LE2d 682) (1965).

[4] Because in at least one Georgia habeas case a defendant's first appearance was characterized as an "arraignment," see *Collins v. Francis*, supra, 728 F2d at 1332, we point out that in Georgia, an arraignment may precede an indictment only if a defendant waives indictment and consents to being tried upon an accusation. See OCGA §§ 17-7-70 (a) and 17-7-93.

[5] We note that the magistrate had no power to set bond. See *Lane v. State*, 247 Ga. 387 (276 SE2d 644) (1981).

Butler answered that he did not. Butler next denied handing a note to the police officer who had transported him to the courtroom. However, when the state produced the note and suggested that it might refresh his memory from ten minutes previously, Butler admitted writing the note, which read as follows: "Mr. Robert E. Wilson, my name is Michael A. Butler. Mr. Wilson, if I help you pin Eddie Lee Ross, what will you do for me? He told me about the case. I will help you, if you help me. No tricks, Mr. Wilson. Help me. I will help you. I would like to talk to you alone. No tricks, Mr. Wilson."

Further examination revealed that Ross had admitted to Butler that he had robbed, raped and killed an elderly woman and that "he was going to plead crazy or play crazy to beat his case."

In his fourth enumeration of error, Ross alleges that the prosecutor's tactics were improper and that the trial court erred by denying Ross's timely motion for mistrial.

(a) Ross first contends that it is obvious from Butler's testimony that the prosecutor had discussed Butler's testimony with him prior to his taking the stand as the first defense witness and that this discussion violated the rule of sequestration.

The rule is that "either party shall have the right to have the witnesses of the other party examined out of the hearing of each other." OCGA § 24-9-61. The rule does not prohibit discussions between an attorney to the case and a prospective witness, at least so long as the attorney talks to him separately from the other witnesses and does not inform him of previous testimony. *Shouse v. State*, 231 Ga. 716 (15) (203 SE2d 537) (1974); *Travelers Ins. Co. v. Sheppard*, 85 Ga. 751 (36) (12 SE 18) (1890); *Silas v. State*, 133 Ga. App. 560 (2) (211 SE2d 609) (1974); *Rozier v. State*, 124 Ga. App. 481 (2) (184 SE2d 203) (1971).

Thus, even if we agreed with Ross that the record demonstrates that the prosecutor talked to Butler before he testified (see below), we would find no violation of the rule of sequestration.

(b) Immediately after the state read Butler's note to him, the state suggested to Butler that he knew more than he had been telling and that, in fact, Ross had admitted the crime to him. Butler responded affirmatively. Later examination revealed that although Butler had originally been charged as an "[a]ccessory to armed robbery and murder," the murder charge had been dropped.

Ross argues that the foregoing testimony establishes that the state talked to Butler before he testified and that a "deal" had been reached. Therefore, he contends, the state's failure to correct Butler's "false" testimony that there was no deal violated Ross's right to due process of law. See *Giglio v. United States*, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972).

We cannot agree that the record shows that the state allowed

false testimony to go uncorrected. Butler testified that he had wanted to discuss the case with the district attorney, but attempts at telephonic communication had been unsuccessful; hence, the note. The state's question of Butler concerning his knowledge of the case is explained by its possession of the note (in which Butler plainly stated that Ross had told him about the case) and does not compel an inference that, contrary to Butler's testimony, he had previously discussed the case with the prosecution. Regarding the dropped murder charge, Butler apparently had never been accused of directly committing the crime, and, in any event, testimony that the charge had been dropped at some unspecified time for some unspecified reason is insufficient to demonstrate the falsity of Butler's positive testimony that there was no deal nor any discussion between him and the prosecution.

Moreover, other circumstances of the case are inconsistent with prior discussions or a deal. If Butler had succeeded in contacting the district attorney the previous day, he would have had no reason to pass a note to the district attorney (via the transporting officer) shortly before he testified. If he had successfully struck some sort of bargain with the state, in exchange for testimony incriminating Ross, he would not have had any reason to deny, initially, all knowledge of the case except for Ross's physical appearance after his arrest, nor any reason to continue the denial until confronted with the note. Finally, this was not a case in which the state sought incriminating testimony against one defendant from a co-defendant, which testimony would doubtless incriminate also the co-defendant, and, hence, would be protected by the co-defendant's privilege against self-incrimination. Butler had no such privilege, and therefore was "obliged to assist the authorities," with or without a deal. *Roberts v. United States*, 445 U. S. 552, 558 (100 SC 1358, 63 LE2d 622) (1980).

We do not find that the state allowed false testimony to go uncorrected.

(c) Alternatively, Ross contends that even if there was no deal, but merely an offer of one, the state should have disclosed it under authority of *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

Of course, *Brady* does not compel the state to disclose inculpatory evidence, and Butler's testimony concerning Ross's admissions was clearly inculpatory. Moreover, *Brady* does not require disclosure of evidence tending to impeach the credibility of a defense witness, since that ordinarily is not exculpatory. Ross, however, contends that, since Butler's incriminating testimony effectively converted him into a state's witness, the state was required, under *Brady*, to disclose any evidence tending to impeach Butler's testimony, including his offer to make a deal.

Assuming that this contention is correct, the fact remains that

the state *did* disclose this evidence, albeit only after Butler took the stand. The *Brady* rule "involves the discovery, *after trial*, of information which had been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U. S. 97, 103 (96 SC 2392, 49 LE2d 342) (1976). (Emphasis supplied.) *Brady* itself does not require the pre-trial disclosure of exculpatory evidence and is not violated when the evidence is presented to the jury at trial. *Castell v. State*, 250 Ga. 776 (2b) (301 SE2d 234) (1983).

The note was disclosed, and Ross was allowed extensive cross-examination on that issue. If Ross felt that his cross-examination was insufficient to bring out the whole truth in this regard, "the proper motion would have been for an adequate recess, not [a] mistrial." *Wallin v. State*, 248 Ga. 29, 34 (279 SE2d 687) (1981). Moreover, Ross has never demonstrated that the full truth was not revealed even though he had ample opportunity to do so after trial. See Rules IV (A) (5) (b) and IV (A) (6) of the Unified Appeal Procedure, as amended, 252 Ga. A-13 et seq. (Ross filed a motion for new trial, see fn. 1 of this opinion; however, no *Brady* or *Giglio* ground for new trial was raised. R. 126, 137.)

There remains, then, only Ross's contention that, had the state disclosed the note before Butler took the stand (pre-trial disclosure obviously was not possible, since the note did not exist until the day Butler testified), Ross "could have made a reasoned decision whether to call Butler [as a defense witness] and thereby vouch for his credibility." This contention demonstrates no reversible error, for two reasons. First, the jury was never instructed that a party vouched for the credibility of a witness merely by calling him. Second, Ross was allowed to cross-examine Butler, dispelling any notion that Ross was vouchsafing Butler's credibility.

Butler's testimony was obviously prejudicial, because it was incriminating. It was not inadmissible, however, and it would doubtless have been offered in any event. That is, prior disclosure of the note would not have resulted in the suppression of Butler's testimony. Nor has it been shown that prior disclosure would have revealed anything that was not brought out at trial. Thus, we find no reversible error in the delayed disclosure of the note.

5. During the sentencing phase of the trial, the state offered evidence that Ross had murdered one elderly woman and raped another in two incidents unrelated to the crimes charged in the indictment in this case. At the time this evidence was offered, Ross had not been indicted, tried, or convicted for either of these offenses. Ross's fifth and sixth enumerations of error complain of the introduction of this evidence in aggravation.

(a) Ross complains that the state did not provide him with notice of the state's intention to present this evidence in aggravation until

the day the trial began.

We find no error here. The law provides that "only such evidence in aggravation as the state has made known to the defendant prior to his trial shall be admissible." OCGA § 17-10-2. Notice was provided before the jury voir dire began and was therefore timely.

(b) We find no merit to the contention that the trial court erred by instructing the jury that "you may provide for a life sentence for the accused for any reason that is satisfactory to you, or without any reason, if you care to do so." The charge was a correct statement of the law. We do not agree that giving the jury an absolute discretion to recommend mercy is unconstitutional. See *Conner v. State*, 251 Ga. 113, 119 (303 SE2d 266) (1983).

(c) Ross's contention that the state could prove in aggravation only crimes for which Ross had been convicted is meritless for reasons stated in *Devier v. State*, 253 Ga. 604 (9) (323 SE2d 150) (1984).

(d) Nor do we find any merit to Ross's contention that the court should have instructed the jury not to consider these "other" crimes in aggravation unless it found beyond a reasonable doubt that Ross had committed them.

Georgia law does not allow the imposition of the death penalty unless the jury finds at least one statutory aggravating circumstance beyond a reasonable doubt, and the jury must be so charged. OCGA § 17-10-30 (c). However, once the jury crosses this threshold, it may consider *all* the evidence that has been presented in both phases of the case. *Zant v. Stephens*, 250 Ga. 97 (297 SE2d 1) (1982). "In considering this evidence, the jury does not attempt to decide whether particular elements have been proved, but instead makes a unique, individualized judgment regarding the punishment that a particular person deserves. See *Lockett v. Ohio*, 438 U. S. 586, 602-605 [(98 SC 2954, 57 LE2d 973)] (1978)." *Zant v. Stephens*, ___ U. S. ___ (103 SC 2733, 77 LE2d 235) (1983) (Rehnquist, J., concurring).

The admissibility of "other crime" evidence is a matter determined by the trial court. *Felker v. State*, 252 Ga. 351 (1c) (314 SE2d 621) (1984). Once admitted, the jury is entitled to consider it, along with all the other evidence, in its deliberations on the ultimate question of whether to impose the death sentence. We discern no constitutional or statutory requirement that a jury must evaluate each and every evidentiary vignette pursuant to the reasonable doubt standard.

6. On the issue of mitigating circumstances, the court charged as follows:

"Now, Ladies and Gentlemen of the jury, you should consider all the evidence submitted in both phases of the trial in this case and arrive at your verdict as to the sentence to be imposed. This would include any evidence of mitigating circumstances received by you in this case.

"Now, Ladies and Gentlemen, even if you find beyond a reasonable doubt the State has proved the existence of aggravating circumstances in this case which would justify the imposition of a death sentence, you are not required to recommend that the accused be put to death. You would be authorized, under the circumstances, to recommend the death penalty, but you are not required to do so.

". . . You may provide for a life sentence for the accused for any reason that is satisfactory to you, or without any reason, if you care to do so."

Under Georgia law, a jury should be informed that it can consider all of the evidence presented during both phases of the trial (guilt-innocence and sentence), *Spivey v. State*, 241 Ga. 477, 481 (246 SE2d 288) (1978); it should be instructed to consider mitigating circumstances, *Hawes v. State*, 240 Ga. 327 (9) (240 SE2d 833) (1977), and it should be clearly and explicitly informed that it may recommend a life sentence even if it finds one or more statutory aggravating circumstances beyond a reasonable doubt, *Fleming v. State*, 240 Ga. 142 (7) (240 SE2d 37) (1977). The charge in this case satisfied these requirements.

Ross, however, contends that the instructions given were constitutionally inadequate because they do not "define" what mitigating circumstances are, nor "explain" their nature and function in the process of deliberations. As authority for this contention, he relies upon several decisions of the Fifth and Eleventh Circuit Courts of Appeals. See *Morgan v. Zant*, 743 F2d 775 (11th Cir. 1984); *Finney v. Zant*, 709 F2d 643 (11th Cir. 1983); *Westbrook v. Zant*, 704 F2d 1487 (11th Cir. 1983); and *Spivey v. Zant*, 661 F2d 464 (5th Cir., Unit B, 1981).

We find these decisions to be inconsistent with pronouncements by the United States Supreme Court.

In *Jurek v. Texas*, 428 U. S. 262, 271-272 (96 SC 2950, 49 LE2d 929) (1976), a plurality of the Supreme Court stated: "[I]n order to meet the requirement[s] of the Eighth and Fourteenth Amendments, a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances. In *Gregg v. Georgia* [428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976)], we today hold constitutionally valid [Georgia's] capital-sentencing system[,] [ which] directs the jury to consider any mitigating factors . . . The Texas statute does not explicitly speak of mitigating circumstances; it directs only that the jury answer three questions. Thus, the constitutionality of the Texas procedures turns on whether the enumerated questions allow consideration of particularized mitigating factors."

The plurality concluded that the second of these three statutory questions — which asks the jury to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" — sufficiently

allowed jury consideration of mitigating circumstances. Thus the Texas statute met the requirements of the Eighth Amendment.

In our opinion, if the Texas statutory questions sufficiently focus a jury's attention on mitigating circumstances, then the charge in this case was constitutionally sufficient. We find unpersuasive the notion that the Texas system of three special interrogatories (only one of which arguably even authorizes the *presentation* of mitigating evidence) so much more satisfactorily focuses the jury's attention on the circumstances of the offense that a total lack of any instruction whatever on the concept of mitigating circumstances is constitutionally adequate, while in Georgia a sentencing charge is constitutionally deficient unless the jury is told "what a mitigating circumstance is and what its function is in the jury's sentencing deliberations." *Spivey v. Zant*, supra at 471.

More recently, the United States Supreme Court ruled in *Zant v. Stephens*, supra, 103 SC at 2750, that "the Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances."

"[W]e find it persuasive that the U. S. Supreme Court does not require that a jury in Georgia be instructed as to specific standards for weighing aggravating and mitigating circumstances (i.e., the jury need not be instructed as to the function of mitigating circumstances), so long as the jury is allowed and instructed to consider any evidence in mitigation and is instructed, as here, that it has the discretion, notwithstanding proof of aggravating circumstances, to sentence the defendant to life in prison for any reason satisfactory to the jury or without any reason." *Smith v. Francis*, 253 Ga. 782, 786 (325 SE2d 362) (1985).

The Fourth Circuit has recently criticized the willingness of the Fifth and Eleventh Circuits "to engage in detailed scrutiny of state jury instructions on collateral review," stating: "It is inappropriate for the federal courts on collateral review to go beyond the correction of fundamental errors implicating due process rights and attempt to prescribe the particular form which state jury instructions on mitigation must take, becoming mired in the nuances of definition and technicalities of draftsmanship." *Briley v. Bass*, 750 F2d 1238, 1245 (4th Cir. 1984).

We agree, and we hold that the charge given in this case satisfied the essential requirements of due process under the Eighth and Fourteenth Amendments. See *Smith v. Francis*, supra; *Smith v. State*, 249 Ga. 228, 229 (290 SE2d 43) (1982); *Cape v. State*, 246 Ga. 520 (272 SE2d 487) (1980).

Ross's seventh enumeration is meritless.

7. In his eighth enumeration of error, Ross complains for the first time on appeal of the prosecutor's closing argument at the sentencing

phase of the trial.

The question whether a defendant is someone whose probable future behavior indicates a need for the most effective means of incapacitation, i.e., the death penalty, is not constitutionally irrelevant. *California v. Ramos,* ___ U. S. ___ (103 SC 3446, 77 LE2d 1171) (1983); *Jurek v. Texas,* supra. Arguments addressing this question are not improper if based on evidence adduced at trial. See, e.g., *Spivey v. State,* 253 Ga. 187, supra, (4); *Horton v. State,* 249 Ga. 871 (7) (295 SE2d 281) (1982).

Other portions of the argument in this case were objectionable, for reasons stated in *Conner v. State,* 251 Ga., supra, 113 at (6). See also *Hoerner v. State,* 246 Ga. 374 (4) (271 SE2d 458) (1980). However, no timely objections were interposed, and the argument here, considered in its entirety, did not involve such egregious misconduct on the part of the prosecutor, and was not so prejudicial or offensive, as to require reversal of the death sentence — despite the lack of timely objection — on the basis that the sentence was impermissibly influenced by passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1); *Spivey v. State,* supra.

8. The jury found as statutory aggravating circumstances:

"That the offense of murder was committed while the offender was engaged in the commission of another capital felony, to wit: rape;

"That the offense of murder was committed while the offender was engaged in the commission of burglary; [and]

"That the offense of murder was outrageously and wantonly vile, horrible or inhuman in that it involved torture, depravity of mind and an aggravated battery to the victim." See OCGA §§ 17-10-30 (b) (2) and (b) (7).

(a) Ross was convicted of rape and burglary and we have already found that those convictions were supported by sufficient evidence. For the same reasons, the jury's first two findings, above, are supported by the evidence beyond a reasonable doubt. OCGA § 17-10-35 (c) (2).

(b) The evidence in this case shows that Ross broke into the home of the 87-year-old victim, beat her repeatedly on the head with a blunt object, stabbed her 13 times with a pair of scissors, and then raped her. These facts support the jury's finding of the § b (7) aggravating circumstance. See *Allen v. State,* 253 Ga. 390 (6) (321 SE2d 710) (1984); *Whittington v. State,* 252 Ga. 168 (9b) (313 SE2d 73) (1984); *West v. State,* 252 Ga. 156 (Appendix) (313 SE2d 67) (1984); *Phillips v. State,* 250 Ga. 336 (6) (297 SE2d 217) (1982); *Hance v. State,* 245 Ga. 856 (3) (268 SE2d 339) (1980).

9. We find that Ross's death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1).

10. We find that the sentence of death imposed in this case is neither excessive nor disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). The similar cases listed in the appendix support the death penalty.

*Judgment affirmed. All the Justices concur, except Smith, J., not participating.*

### APPENDIX.

*Allen v. State*, 253 Ga. 390 (321 SE2d 710) (1984); *Felker v. State*, 252 Ga. 351 (314 SE2d 621) (1984); *Brown v. State*, 250 Ga. 66 (295 SE2d 727) (1982); *Horton v. State*, 249 Ga. 871 (295 SE2d 281) (1982); *Justus v. State*, 247 Ga. 276 (276 SE2d 242) (1981); *Green v. State*, 246 Ga. 598 (272 SE2d 475) (1980); *Gates v. State*, 244 Ga. 587 (261 SE2d 349) (1979); *Brooks v. State*, 244 Ga. 574 (261 SE2d 379) (1979); *Collins v. State*, 243 Ga. 291 (253 SE2d 729) (1979); *Spraggins v. State*, 243 Ga. 73 (252 SE2d 620) (1979); *Davis v. State*, 242 Ga. 901 (252 SE2d 443) (1979); *Johnson v. State*, 242 Ga. 649 (250 SE2d 394) (1978); *Moore v. State*, 240 Ga. 807 (243 SE2d 1) (1978); *Bowden v. State*, 239 Ga. 821 (238 SE2d 905) (1977); *Stephens v. State*, 237 Ga. 259 (227 SE2d 261) (1976); *Gibson v. State*, 236 Ga. 874 (226 SE2d 63) (1976); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975); *McCorquodale v. State*, 233 Ga. 369 (211 SE2d 577) (1974).

DECIDED FEBRUARY 8, 1985 —
REHEARING DENIED FEBRUARY 26, 1985.

*John G. Harkins, Jr.*, for appellant.
*Robert E. Wilson, District Attorney, Michael J. Bowers, Attorney General, J. Michael Davis,* for appellee.