22914

The STATE, Respondent v. James Russell CAIN, Appellant.

(377 S. E. (2d) 556)

Supreme Court

---

*John H. Blume, David I. Bruck,* of *Bruck & Blume, S. C. Office of Appellate Defense,* Columbia, *Burnie W. Ballard,* Pageland, and *George W. Gregory,* Chesterfield, *for appellant.*

*Atty. Gen. T. Travis Medlock, Asst. Attys. Gen. Harold M. Coombs, Jr.* and *Amie L. Clifford,* Columbia, and *Sol. J. Dupre Miller,* Bennettsville, *for respondent.*

Heard Feb. 1988.

Decided Oct. 24, 1988.

HARWELL, Justice:

Appellant was convicted of two (2) counts of murder and sentenced to death on both counts. This appeal consolidates

his direct appeal and this Court's mandatory review of the death sentences pursuant to S. C. Code Ann. § 16-3-25 (1985). We affirm both the convictions and sentences.

## I FACTS

Appellant and Kenneth Dale Threatte (Threatte) were indicted for murdering Danny Adams (Adams) and Kerry Kemmerlin (Kemmerlin). Threatte, the state's primary witness at trial, testified as follows:

Appellant's mother, Patsy Cain Evans, told appellant and Threatte that she wanted Adams murdered because Adams had failed to pay her after a drug transaction. On January 25th, 1986, appellant and Threatte met with Adams and Kemmerlin for the ostensible purpose of stealing some marijuana from a Chesterfield County field. The four traveled in Adams's van, with Adams driving, Kemmerlin sitting in the passenger seat, and appellant and Threatte sitting on a sofa in the rear. Appellant was armed with a shotgun; Threatte carried a pistol. As Adams slowed at a rural crossroads, appellant jumped forward, pointed the shotgun toward Adams's chin, and shot off Adams's face. Threatte fired two (2) pistol shots toward the front of the van. Laughing, appellant turned and shot Kemmerlin. When the van stopped rolling, appellant fired two (2) more shotgun blasts into Adams and Kemmerlin. Threatte helped appellant pull both bodies out of the van. At appellant's instructions, Threatte removed between $700 and $800 from Adams's pockets. Appellant then started the van and drove the front wheels on top of the bodies.

An expert forensic pathologist testified that both Adams and Kemmerlin died immediately from shotgun blasts to the head. The expert further testified that a pistol bullet entered Kemmerlin's back after Kemmerlin was already dead from the shotgun blast.

## II JUROR QUALIFICATION

First, appellant asserts the trial judge committed two errors during the juror qualification stage:

## A. *Juror Catoe*

The trial judge excused prospective juror Luella Catoe based upon her views regarding capital punishment. Ms. Catoe flatly stated during *voir dire* examination that she could not vote for the death penalty if she "had not seen the act," regardless of the evidence. Because her opposition to the death penalty would have prevented or substantially impaired her ability to perform her duties as a juror during the sentencing phase, she was properly disqualified. *See Lockhart v. McCree*, 476 U. S. 162, 106 S. Ct. 1758, 90 L. Ed. 137 (1986); *State v. Drayton*, 293 S. C. 417, 361 S. E. (2d) 329 (1987).

## B. *Juror Rivers*

The court qualified prospective juror Sheila Rivers, and appellant excluded her by use of a peremptory strike. Appellant claims Ms. Rivers should have been disqualified by the court because she stated that the mitigating factors of age and background would make no difference in her sentencing decision.

The responses of challenged prospective jurors must be examined in context of the entire *voir dire. State v. Gaskins*, 284 S. C. 105, 112, 326 S. E. (2d) 132, 137, *cert. denied*, 471 U. S. 1120, 105 S. Ct. 2368, 86 L. Ed. (2d) 266 (1985). Ms. Rivers stated that she could give the state and appellant a fair and impartial trial, would accept and follow the law as charged, could vote for either life imprisonment or the death penalty, and would consider mitigating circumstances as instructed by the trial court. Qualification of this juror was proper in light of her entire *voir dire* testimony. Additionally, because appellant failed to use all of his peremptory strikes, he is unable to show any prejudice. *See State v. Singleton*, 284 S. C. 388, 326 S. E. (2d) 153, *cert. denied*, 471 U. S. 1111, 105 S. Ct. 2346, 85 L. Ed. (2d) 863 (1985).

## GUILT PHASE

### III *BRADY* VIOLATION

Appellant next contends that the state failed to reveal "certain negotiations" held with Threatte before he testified, thereby violating appellant's right to due

process. Some background information is essential in addressing appellant's claim.

Several months before trial, appellant filed a motion for disclosure of impeaching information pursuant to *Brady v. Maryland*, 373 U. S. 83, 83 S. Ct. 1194, 10 L. Ed. (2d) 215 (1963), and *Giglio v. United States*, 405 U. S. 150, 92 S. Ct. 763, 31 L. Ed. (2d) 104 (1972). The trial judge granted the motion as follows:

> I grant Paragraph (1) as it relates to any monetary compensation given to or promised to the witness, any plea bargain arrangement of any nature whatsoever, any immunity grant of any nature whatsoever, any plea bargain discussion of any nature, and any criminal proceeding by the state in reference to that particular witness.

> Number (2) is granted as it relates to any pending charges against the witness ... The court specifically denies any kind of inquiry into probationary, parole, or prison status because I do not think that is in the prerogative of the state or the prosecuting attorney.

At trial, Threatte testified that "nothing" had been promised him in return for his testimony.

Threatte's plea hearing on the same counts of murder and armed robbery was held five (5) days after appellant's conviction. Pursuant to "certain discussions and certain negotiations" between Threatte's counsel and the solicitor, Threatte pled guilty to one count of murder. The state withdrew its Notice of Intention to seek the death penalty; the remaining indictments for murder and armed robbery were nol prossed, and Threatte was sentenced to life imprisonment.

At the plea hearing, Threatte's counsel referred to discussions he had with the solicitor a week *before* Threatte testified at appellant's trial. Threatte's counsel stated that the solicitor "assured" him during these discussions that the solicitor "would do everything that he could to see that" Threatte was not imprisoned in the same facility as appellant and another convict.

Appellant claims that the solicitor's failure to disclose this discussion violated the *Brady* order and necessitates reversal. We disagree.

First, this case is distinguishable from *State v. Hinson*, 293 S. C. 406, 361 S. E. (2d) 120 (1987). In *Hinson*, we granted the appellant leave to move for a new trial where the solicitor had announced "[m]oments after" the jury found the appellant guilty that the state's witness who testified against him would not be prosecuted. The *Hinson* record "strongly suggest[ed] an undisclosed promise" to grant the witness immunity. *Id.* at 408, 361 S. E. (2d) at 121. Such a suggestion is not present here. The record here contains only a passing reference to a pre-trail statement by the solicitor that he would assist, if possible, in keeping Threatte from being incarcerated in the same institution as appellant. There is no evidence giving rise to an inference that an undisclosed immunity grant or plea bargain existed, or that Threatte perjured himself in testifying he had been promised nothing. The five (5) day period between appellant's sentencing and Threatte's plea hearing afforded ample opportunity for the solicitor and Threatte's counsel to negotiate the plea agreement. The solicitor's decisions to accept Threatte's guilty plea to only one count of murder and to withdraw the death penalty notice were logical in light of the physical evidence and testimony presented in appellant's trial. Accordingly, we hold that the trial court's disclosure order was not violated.

Second, even assuming this pre-testimony "assurance" was given to Threatte and not disclosed to the defense, reversal is not constitutionally mandated.

In *United States v. Bagley*, 473 U. S. 667, 673-674, 105 S. Ct. 3375, 3379, 87 L. Ed. (2d) 481, 489 (1985), the United States Supreme Court stated that *Brady v. Maryland* "requires disclosure only of evidence that is *both* favorable to the accused *and* 'material either to guilt or punishment.' " (Emphasis added.) Evidence is material, the majority agreed, "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to overcome confidence in the outcome." *Id.* at 682, 105 S. Ct. at 3384, 87 L. Ed. (2d) at 494.

Even assuming an agreement existed here, there is no reasonable probability that its disclosure would have changed the result of the guilty phase of appellant's trial.

The physical evidence, the laboratory tests, the bodies, the crime scene, the pathologist's testimony—all these factors strongly supported the testimony of Threatte, the only eyewitness. We are confident that disclosure to the defense of a pre-trial assurance by the solicitor to assist Threatte in being incarcerated in an institution separate from appellant would have had no effect on the jury's verdict.

## PENALTY PHASE

### IV  STATUTORY MITIGATING CIRCUMSTANCES

Appellant asserts that the trial judge erred in failing to charge the statutory mitigating circumstances found at S. C. Code Ann. Section § 16-3-20(C)(b)(2) (1985) (murder committed while defendant under the influence of mental or emotional disturbance). Appellant claims evidence that he was subjected to both physical and psychological abuse by his mother throughout his life necessitated the "emotional distubance" charge. We disagree.

The trial judge "has a duty to review all statutory mitigating circumstances and instruct the jury as to any which *may be supported by the evidence* and not merely those which are requested by the defendant." *State v. Bellamy,* 293 S. C. 103, 106, 359 S. E. (2d) 63, 65 (1987) (emphasis added); *see* S. C. Code Ann. § 16-3-20(C) (1985). While ample evidence reconstructed the often deplorable conditions under which appellant was reared, no evidence existed to show that appellant acted under the influence of a mental or emotional disturbance *at the time* he committed the murders. *See State v. Pierce,* 289 S. C. 430, 346 S. E. (2d) 707 (1986) )("mental or emotional disturbance" instruction mandated where defendant was using drugs and extremely intoxicated during commission of crimes). There was no error in the refusal to charge the jury on this statutory mitigating circumstance.

### V  STATUTORY AGGRAVATING CIRCUMSTANCE

The state sought imposition of the death penalty based on three alleged aggravating circumstances: S. C. Code Ann. § 16-3-20(C)(a)(1)(d) (armed robbery); § 16-3-20(C)(a)(4) (murder for money); and § 16-3-20(C)(a)(6) (offender caused or directed another to commit murder or committed murder

as agent or employee of another). The jury acquitted appellant of armed robbery; the trial judge accordingly refused to charge that aggravating circumstance. The judge submitted the "murder for money" aggravating circumstance on the basis of testimony by appellant's cellmate that appellant had stated that "someone in Florence" had paid him (appellant) to commit the murders. The trial judge charged the "agent or employee" aggravating circumstance based on his interpretation of "agent" in Section 16-3-20(C)(a)(6) as broad enough to include those who murder "on behalf of another." The jury rejected the "murder for money" aggravating circumstance and based its death penalty recommendations on Section 16-3-20(C)(a)(6). The aggravating circumstance finding quoted the statutory language: "The offender caused or directed another to commit murder or committed murder as an agent or employee of another person."

Appellant attacks the constitutionality of his death sentences. He contends the trial court erred in submitting to the jury "both parts" of Section 16-3-20 (C)(a)(6). This charge, appellant argues, caused the jury to return a written aggravating circumstance finding that was ambiguous because it was rendered in the disjunctive. We disagree.

First, the error, if any, in submitting the first portion of Section 16-3-20(C)(a)(6) ("offender caused or directed another to commit murder") was harmless. No evidence was presented from which a reasonable juror could have found that appellant "caused or directed" any other individual to commit murder.

No guilt phase testimony suggested that appellant "caused or directed" Threatte to commit murder. Threatte's testimony unequivocally established that appellant's *mother* motivated the murderers, then instructed them to wash their blood-stained clothes and leave town after the murders. Sherry Lynn Knight, charged as an accessory to murder, testified that appellant's mother asked appellant whether he had brought back one of the victim's fingers as "a souvenir" in accordance with her pre-murder instructions. Stephen Mark Richardson, who informed police of appellant's role in the murders, testified that appellant

stated that he committed the murders on behalf of Patsy Cain Evans. The state's theory in aggravation, made clear to the jury during the penalty phase summation, was that appellant committed murder as an *agent*, not as a directing principal. The defense's penalty phase summation was aimed at persuading the jury that appellant was not his mother's agent. Both phases of appellant's trial clearly focused jury attention on appellant's role as his mother's agent.

Additionally, we reject appellant's contention that Section 16-3-20(C)(a)(6) contains two separate aggravating circumstances. We interpret that section to reflect a legislative intent to create one aggravating circumstance making both principal and agent in a murder scheme eligible for the death penalty. The Legislature has decided not to distinguish the relative culpability of principal and agent. We discern no constitutional infirmity in either that decision or the aggravating circumstance finding upon which the jury based appellant's death sentences.

Next, appellant argues that he was not an "agent or employee" within the meaning of Section 16-3-20(C) (a)(6) because he received no money for the killings. We have upheld application of the "agent or employee" aggravating circumstance to facts involving a murder-for-hire scheme. *See State v. Gaskins, supra.* We refuse, however, to limit the definition of "agent" under the statute to include only those hired or paid to murder.

Georgia's Supreme Court faced this issue in *Whittington v. State*, 252 Ga. 168, 313 S. E. (2d) 73 (1984), where the defendant had been convicted and sentenced to death for killing her paramour's wife. The jury based its death sentence on the "agent or employee" aggravating circumstance. *See* Ga. Code Ann. Section 17-10-30(b)(6) (1982). While acknowledging that the defendant was "motivated" to kill by her paramour, the Georgia court ruled 4-3 that she was not acting as an "agent" because she was not "hired" by the paramour. 252 Ga. at 178, 313 S. E. (2d) at 82. Accordingly the court vacated the death sentence.

To restrict our construction of "agent" as narrowly as Georgia's would lead to an absurd result in terms of this state's capital sentencing scheme. To construe "agent" to

mean only "one who is paid to act for another"—a hired killer—would result in this portion of Section 16-3-20(C)(a)(6) duplicating the aggravating circumstance in Section 16-3-20(C)(a)(4) (murder committed for purpose of receiving money or any other thing of monetary value). We refuse to construe the death penalty statute to reflect a legislative intent to create two *identical* statutory aggravating circumstances. The clear intent behind legislative enactment of these subsections was to create two distinct aggravating circumstances.

We have long held that statutory terms should be construed to encompass their plain and ordinary meanings. *State v. Hardee,* 279 S. C. 409, 308 S. E. (2d) 521 (1983). "Agent," then, as used in Section 16-3-20(C)(a)(6) means one who acts on behalf of another. *See Whittington v. State, supra* (Weltner, J., dissenting).

Appellant also argues that a construction broad enough to include him as an "agent" under Section 16-3-20(C)(a)(6) would contravene the mandate of *Zant v. Stephens,* 462 U. S. 862, 103 S. Ct. 2733, 77 L. Ed. (2d) 235 (1983) and render the aggravating circumstance unconstitutional. We disagree.

*Zant* describes two constitutionally indispensable features of any aggravating circumstance: first, it "must genuinely narrow the class of persons eligible for the death penalty"; second, it "must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Id.* at 877, 103 S. Ct. at 2742, 77 L. Ed. (2d) at 249. Appellant concedes the "agency" factor narrows the class of persons eligible for the death penalty; it does not, he argues, do so in a meaningful manner reasonably justifying the imposition of the death penalty if "agent" is construed to include those who murder gratuitously on behalf of another.

As stated earlier, Section 16-3-20(C)(a)(6) reflects a legislative intent to make both the principal (the director) and the agent (the actor) in a murder scheme eligible for the death penalty. One who murders at the request or motivation of another exhibits that most socially destructive of character traits—a total lack of conscience. The "agent" kills not to satisfy his own desires or ends, but merely to satisfy the desires of another. The "agency" murder, the

product of a bankrupt human conscience fueled by the motives of another, is especially shocking. The victim, who might reasonably be expected to be wary of or fear the principal, is rendered even more helpless by his lack of suspicion of the agent.

Nor do we believe that the agent-murderer is any less culpable, his act any less heinous, because no money can be shown to have actually changed hands between principal and agent. Here, Threatte testified that appellant's mother wanted Adams killed because he owed her money for cocaine. Richardson also testified that appellant stated his motive immediately after the murders:

> [Appellant] said they did it for his mama so that word got out that she wouldn't have trouble collecting her debts anymore and that there were two more people that they were going to take care of because of money owed and that from then on anybody that didn't pay their [sic] mama they was going to take care of it.

The testimony in the record clearly supports the inference that appellant killed on behalf of his mother in furtherance of her drug business. That appellant acted as an agent heightened his culpability under the circumstances here and imposition of the "more severe sentence" was reasonably justified.

## VI SOLICITOR'S PENALTY PHASE SUMMATION

Appellant next asserts that the solicitor's penalty phase closing argument denied him a fair and constitutionally reliable determination of his sentence. We disagree.

Appellant attacks three (3) portions of the summation. First, the solicitor informed the jury that a death penalty verdict would send a message to surrounding counties that "[Y]ou don't do that [murder] in Chesterfield County without paying the price." Next, the assistant solicitor equated the van in which the murders were committed with a courtroom, noting that "Adams and ... Kemmerlin didn't have the benefit of having 12 people good and true, their peers, to sit on their trial ... The murderer picked the courtroom ... [and] was their jury." Finally, the assistant solicitor argued that the facts justified imposition of the death penalty:

How do I know it was bad enough? Because I brought you something that will make you grimace when you look at it, worse than anything you thought existed in Chesterfield County.

A proper penalty phase summation is one carefully tailored so as not to appeal to the personal bias of a juror, nor calculated to arouse his passion or prejudice. *State v. Bell,* 293 S. C. 391, 360 S. E. (2d) 706 (1987); *State v. Reed,* 293 S. C. 515, 362 S. E. (2d) 13 (1987). The solicitor must confine his comments to the record and its reasonable inferences and must focus on the characteristics of the defendant and the nature of the crime. *State v. Reed, supra.*

The first and third challenged comments here, when viewed in the context of the entire summation, were no more than recommendations by the solicitor as to the appropriateness of the death penalty based on evidence adduced at trial. The "send a message" argument here certainly did not rise to the level of arousing juror passion or prejudice. The third challenged comment did not improperly inject the solicitor's personal opinion, but rather served as a legitimate reminder of the gruesome nature of the crime.

The second challenged comment, while ill-advised, was isolated and did not improperly focus on appellant's exercise of his jury trial right. Instead, the comment effectively focused the jury's attention on appellant's vicious and arbitrary character in carrying out the illegal executions; it therefore falls within acceptable limits. *State v. Bell, supra.*

## VII PENALTY PHASE INSTRUCTIONS

First, appellant excepts to the trial judge's characterization of the jury's sentencing decision as a "recommendation" throughout his instructions. That characterization, appellant argues, conveyed to the jury the erroneous impression that its verdict would not be binding and contravened *State v. Bellamy*'s requirement that the jury be clearly instructed that its sentencing "recommendation" will be followed.

This state's death penalty statute in fact terms the jury's penalty phase verdict a "recommendation." *See* S. C. Code Ann. § 16-3-20(C) (1985). The trial judge's sentencing in-

structions here did contain the word "recommendation." The judge's statement to the jury at the outset of the penalty phase, however, clearly conveyed the idea that the ultimate decision on punishment was the jury's:

> You will take two charges of murder and I will give you forms in regard to that and you will decide the punishment as it applies to each of the murder cases. You will reach a separate and distinct verdict on each of the murder cases. You now decide the punishment.

This instruction satisfied the *Bellamy* requirement. *See State v. Middleton*, 295 S. C. 318, 368 S. E. (2d) 457 (1988).

Next, appellant argues that the trial judge's failure to specifically instruct the jury that it was able to consider non-statutory mitigating circumstances convinced the jury to consider only statutory mitigating circumstances. We disagree.

The trial judge instructed the jury that, in addition to statutory mitigating circumstances, it could also consider "any extenuating circumstances otherwise authorized or those allowed by law ...". He later made clear to the jury that it was free to consider "mitigating circumstances which [were] supported by the evidence" and to grant appellant a "recommendation of mercy" and impose life imprisonment "for any reason or no reason at all." There was no error in the instruction. *Hitchcock v. Dugger*, 481 U. S. 393, 107 S. Ct. 1821, 95 L. Ed. (2d) 347 (1987), cited by appellant, does not compel a different conclusion. In *Hitchcock*, the United States Supreme Court unanimously held that instructions directing the jury to consider only those mitigating circumstances specifically enumerated in the Florida death penalty statute violated the Eighth Amendment. Because there was no such erroneous instruction here, *Hitchcock* does not mandate reversal of appellant's death sentence.

Finally, appellant asserts that the trial judge's instruction warning the jury to avoid a decision "governed by sympathy, by prejudice, by passion, or by public opinion" persuaded the jury to ignore appellant's case in mitigation. This Court has previously decided this issue contrary to appellant's position. *See State v. Owens*, 293 S. C. 161, 359 S. E. (2d) 275 (1987); *Accord California v. Brown*, 479 U. S. 538, 107 S. Ct. 837, 93 L. Ed. (2d) 934 (1987).

## VIII   PROPORTIONALITY REVIEW

Our review of the entire record convinces us that the death sentence was not the result of passion, prejudice or other arbitrary factor, and the jury's finding of the aggravating circumstance is supported by the evidence. *See* S. C. Code Ann. § 16-3-25 (1985). The death penalty here is not excessive or disproportionate to the penalty imposed in similar capital cases. *See State v. Gaskins, supra.* The convictions and sentences are accordingly

Affirmed.

NESS, C. J., GREGORY and CHANDLER, JJ., concur.

FINNEY, J., dissenting.

FINNEY, Justice, dissenting:

In view of the long-established principle that while a defendant is not entitled to a perfect trial, he must be accorded a fair trial, I dissent from the majority decision affirming this case, being of the opinion that the appellant's right to a fair trial was abridged. *See State v. Stewart,* 278 S. C. 296, 295 S. E. (2d) 627 (1982).

The record sets forth pertinent facts which are omitted from the majority opinion. Appellant James Russell Cain and Kenneth Dale Threatte were each charged with two counts of murder and two counts of armed robbery arising from an incident which occurred on January 25, 1986. The Solicitor's Office notified Threatte and Cain of its intention to seek the death penalty against both of them. On October 2, 1986, the trial court conducted a joint pretrial hearing and disposed of several motions, including a *Brady* motion and a motion for evidence favorable to the defendants (an open file). Threatte's lawyer was present and had an opportunity to participate in the proceedings. However, he did not make any motions and his participation at the hearings appears restrained. The Solicitor's Office informed appellant by a letter dated October 16, 1986, that his case would not be consolidated with Threatte's and that appellant's trial would begin on November 17, 1986. Threatte testified for the state at appellant's trial.

While the jury was deliberating during the sentencing phase of appellant's trial, his mother, Patsy Cain Evans,

entered a plea and received a fifty-year sentence for conspiracy to commit murder, two counts of accessory after the fact of murder, and one count of accessory before the fact of armed robbery arising from the same crimes for which appellant was sentenced to death.

During a civil term of court on the Monday following appellant's Tuesday night death sentence and the court's Thanksgiving recess, Threatte pled guilty to one count of murder. The solicitor dismissed one count of murder and two counts of armed robbery against Threatte.

## GUILT PHASE (*BRADY* MOTION)

Plea bargaining is recognized as a legitimate exercise of a prosecutor's discretion; and it is not unusual for prosecutors to make independent plea agreements with co-defendants. When such an agreement is entered into, the accomplice usually receives some consideration in exchange for truthful testimony during the co-accomplice's trial. *See, e.g., Giglio v. United States,* 405 U. S. 150, 92 S. Ct. 763, 31 L. Ed. (2d) 104 (1972); *United States v. Boley,* 730 F. (2d) 1326, 1333-34 (10th Cir. 1984). However, the United States Constitution imposes restrictions on plea agreements. Under the Due Process Clause, prosecutors have a duty to provide an accused with all favorable evidence, including any plea agreement involving testifying accomplices, which is material to either guilt or punishment. *United States v. Bagley,* 473 U. S. 667, 105 S. Ct. 3375, 87 L. Ed. (2d) 481 (1985); *Giglio v. United States, supra; Brady v. Maryland,* 373 U. S. 83, 83 S. Ct. 1194, 10 L. Ed. (2d) 215 (1963). *See also State v. Hinson,* 293 S. C. 406, 361 S. E. (2d) 120 (1987).

In the instant case, the solicitor failed to disclose his assurance to Threatte's counsel that he "would do everything that he could to see that" Threatte was not imprisoned in the same facility as appellant and another convict.[1] The majority distinguishes this case from *State v. Hinson,* 293 S. C. 406, 361 S. E. (2d) 120 (1987), on the basis of the time elapsing between the testimony and the solicitor's nolle prosequi of the charges. The time factor alone is not deter-

---

[1] In my opinion, the solicitor's "assurance" raises the implication that he would withdraw his plans to seek the death penalty against Threatte.

minative of the issue. Rather, the test should be whether, when considered together with all other surrounding circumstances, the events which transpired lead to the logical conclusion that an undisclosed plea agreement or a prior tacit understanding existed which infers a lack of adventitiousness in the solicitor's actions and inured to the benefit of the testifying codefendant. *See State v. Hinson,* 361 S. E. (2d) at 121-22.

The majority goes further and states that assuming this assurance was given to Threatte, nondisclosure would not mandate reversal because there is no reasonable probability that disclosure would have changed the result of the guilt phase of appellant's trial. In view of the facts of this case, the jury's problem with duress, the jury's aggravating circumstances finding, the solicitor's pretrial assurance to Threatte and subsequent acceptance of a guilty plea with reduced sentencing exposure for Threatte, I disagree with the majority's holding. In my view, the solicitor's acceptance of a guilty plea from the only eyewitness would have created a reasonable probability that the results of the guilt phase and certainly the sentencing phase of appellant's trial would have been changed. *See, e.g., Satterwhite v. Texas,* _____ U. S. _____, 108 S. Ct. 1792, 1797, 100 L. Ed. (2d) 284 (1988). As I read South Carolina's capital sentencing scheme, a defendant in a death penalty case is entitled to every reasonable doubt; and, particularly during the sentencing phase of the trial, to have the triers of the fact fully advised and cognizant of the culpability, responsibility and potential bias of all witnesses.

Due process guarantees a defendant the right to a fair trial, and any evidence tending to impinge upon that right should be subject to disclosure and scrutiny by a jury. Under the facts of this case, Threatte's testimony is so tainted or presumptively unreliable that a new trial is mandated. *United States v. Bagley,* 105 S. Ct. 3375. I find the assurance was material to both phases of appellant's trial and should have been disclosed. Therefore, I should reverse and remand this case for a new trial.

## SENTENCING PHASE

First, the trial court's charge on the statutory mitigating circumstances was erroneous, and this case lacks the requi-

site clear statutory aggravating circumstance finding by the jury for imposition of the death penalty.

Capital punishment has been a feature of American jurisprudence since the framing of our Constitution. For many years the United States Supreme Court rejected the notion that the Constitution imposed some limits on capital punishment. The first major assault on the arbitrariness and capriciousness of capital punishment was not manifested until the Supreme Court's decision in *McGautha v. California*, 402 U. S. 183, 91 S. C. Ct. 1454, 28 L. Ed. (2d) 711 (1971). Even though *McGautha* rejected the arguments that were applicable to every capital punishment proceeding then used in the United States, the Court addressed a number of these arguments in its opinion. First, the court addressed and rejected the argument that leaving the capital punishment sentencing issue to the unguided discretion of the jury invited arbitrary determinations which were fundamentally unfair. Second, the Court rejected the argument that limiting testimony and evidence admissible only on the issue of guilt deprived an accused of a reasonable opportunity to a fair hearing in a death penalty case.. *See McGautha v. California, supra; see also* P. Low, J. Jeffries, Jr., and R. Bonnie, *CRIMINAL LAW* at 783-84 (1981).

In *Furman v. Georgia*, 408 U. S. 238, 92 S. Ct. 2726, 33 L. Ed. (2d) 346 (1972), the Court reversed its course. The arguments the Court initially rejected in *McGautha* were the very ones used to justify the invalidation of every state's capital punishment provisions. In response to *Furman v. Georgia, supra*, South Carolina adopted a death penalty statute that provided for bifurcated proceedings in which consideration of specified aggravating and mitigating circumstances was required before a sentence of death could be imposed. *See* S. C. Code Ann. § 16-3-20(C)(a), (b) (1985). *See also State v. Thompson*, 278 S. C. 1, 292 S. E. (2d) 581, *cert. denied*, 456 U. S. 938, 102 S. Ct. 1996, 72 L. Ed. (2d) 458 (1982); *State v. Shaw*, 273 S. C. 194, 255 S. E. (2d) 799, *cert. denied*, 444 U. S. 957, 100 S. Ct. 437, 62 L. Ed. (2d) 329 (1979); *State v. Rumsey*, 267 S. C. 236, 226 S. E. (2d) 894 (1976). South Carolina's current statutory scheme overcomes the fundamental constitutional deficiencies found in *Furman v. Georgia, su-*

*pra*,[2] by reducing the likelihood that a sentencing body would impose a death sentence capriciously. *See State v. South*, 285 S. C. 529, 331 S. E. (2d) 775, *cert. denied*, 474 U. S. 888, 106 S. Ct. 209, 88 L. Ed. (2d) 178 (1985). In short, our Death Penalty Act statutes do not leave capital sentencing to the unguided discretion of a jury.

The majority's affirmation of this case exhibits a willingness to circumvent *Furman* and our state's reformulated death penalty statutes by upholding the sentence of death in spite of an error infested sentencing proceeding which resulted in an arbitrary and capricious determination. Imposition of the death penalty in this instance cannot withstand constitutional scrutiny.

The trial court erred in submitting the following statutory aggravating circumstance to the jury:

> The offender caused or directed another to commit murder *or* committed murder as an agent or employee of another person. (Emphasis added.)

S. C. Code Ann. § 16-3-20(C)(a)(6) (1985). A literal reading of the statute shows that it contains two statutory aggravating circumstances and is intended to make both the principal and the agent in a murder eligible for the death penalty. In a case where the evidence shows that the defendant was a principal, then the first part of the provision should be submitted. On the other hand, if there is evidence proving he was an agent or employee, the second part of the provision should be submitted. *Id.* The use of the disjunctive conjunction "or"[3] indicates that the evidence must show appellant is either principal or agent, not both.

The death sentence verdicts rendered against appellant are based upon the jury's written finding that "the offender caused or directed another to commit murder or committed murder as an agent or employee of another." These findings

---

[2] "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U. S. 153, 189, 96 S. Ct. 2909, 2932, 49 L. Ed. (2d) 859 (1976).

[3] According to *Webster's Ninth New Collegiate Dictionary* (1987), "or" is used as a function word to indicate an alternative.

reflect that the jury erroneously determined beyond a doubt that appellant "caused or directed another to commit murder." The record contains no evidence to show that appellant caused another person to commit murder. Thus, it was error to submit this aggravating circumstance to the jury, and it was error for the jury to make such a finding. Despite the majority's claim of no constitutional infirmity in this instance, they cannot ascertain whether the jury based its findings on the erroneously submitted alternative. Because of the ambiguous jury findings, imposition of the death penalty is certainly infirm since the jury's discretion was unguided or misguided, resulting in the likelihood of an arbitrary and unfair decision. *See Furman v. Georgia, supra. See also Zant v. Stephens*, 462 U. S. 862, 103 S. Ct. 2733, 77 L. Ed. (2d) 235 (1983).

Second, the majority contravenes the prophylactic rule of charging a jury regarding a statutory mitigating circumstance. Section 16-3-20(C)(b)(2) sets forth the following as a mitigating circumstance:

> The murder was committed while the defendant was under the influence of mental or emotional disturbance.

S. C. Code Ann. § 16-3-20(C)(b)(2) (1985). Appellant argues that the trial court erred in refusing to charge this mitigating circumstance. The record clearly shows that this statutory mitigating circumstance request was supported by the evidence. For instance, evidence was presented at trial showing appellant had been abused, neglected and dominated by his mother. Furthermore, it is uncontradicted that appellant's mother conceived the murder scheme and directed its execution. Even the majority admits that there was ample evidence illustrating the deplorable conditions under which appellant was reared, but reasoned *"no evidence existed* to show that [he] acted under the influence of a mental or emotional disturbance ..."

The trial court has the duty to review all statutory mitigating circumstances and instruct the jury on any which are supported by the evidence. *State v. Bellamy*, 293 S. C. 103, 359 S. E. (2d) 63 (1987); *State v. Pierce*, 289 S. C. 430, 346 S. E. (2d) 707 (1986). In deciding whether a statutory mitigating circumstance is supported by the evidence, the trial court is

concerned only with the *existence* of evidence and not its *weight. State v. Bellamy, supra.* The reasoning of the majority necessitates that a defendant meet a specific unarticulated evidentiary burden in order to establish the existence of a mitigating circumstance at the time of the commission of a crime. Section 16-3-20(C)(b) does not place any such burden on a capital defendant in order to receive a statutory mitigating circumstance charge. *See, e.g., State v. Patrick,* 289 S. C. 301, 308, 345 S. E. (2d) 481 (1986).

It is my opinion that the existence of evidence of neglect, abuse and domination of appellant by his mother supported the requested charge. *State v. Pierce, supra.*

Accordingly, I would reverse and remand this case for a new trial.

