# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Corey Jermaine Brown, Petitioner.

Appellate Case No. 2021-000941

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Greenwood County
Eugene C. Griffith Jr., Circuit Court Judge

---

Opinion No. 28179
Heard September 14, 2022 – Filed September 29, 2023

---

## REVERSED AND REMANDED

---

Appellate Defender David Alexander, of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson, Senior Assistant Deputy Attorney General Mark Reynolds Farthing, both of Columbia; and Solicitor David Matthew Stumbo, of Greenwood, for Respondent.

---

**CHIEF JUSTICE BEATTY:**  A jury convicted Corey Brown of conspiracy to commit grand larceny, armed robbery, and kidnapping.  In a post-trial motion, Brown moved for a new trial on several grounds, including the State's failure to

disclose its negotiations with Shadarron Evans, the State's key witness. The trial court granted the motion, and the State appealed.

The court of appeals reversed the grant of a new trial in *State v. Brown*, Op. No. 2021-UP-253 (S.C. Ct. App. filed July 7, 2021). Agreeing with the State, the court concluded that no plea offer had been extended and remanded the case to the circuit court to make specific findings as to whether the evidence was material to Brown's guilt under *Brady v. Maryland*, 373 U.S. 83 (1963). This Court granted Brown's petition for a writ of certiorari to review the decision of the court of appeals. We reverse and remand the case to the circuit court for a new trial in accordance with this opinion.

## I. FACTS

On July 26, 2013, Latavius Spearman was robbed and kidnapped at gunpoint by a group of five men. Spearman had returned home from work late that night. An unknown man approached him when he exited his car to enter his apartment. Spearman saw a red laser pointer on his chest, and an armed man ordered him back to his car. Another man came out of the darkness, and Spearman was forced to empty his pockets. The men directed Spearman to drive his car, while the gunman sat behind him in the back seat. Spearman followed a grey Camry, driven by the other men, out of his apartment complex. Spearman was told to pull over in a wooded area. In the darkness, the gunman forced Spearman into the back seat of the car then continued driving.

The two cars stopped at a Hot Spot gas station in Greenwood County. There, Spearman grabbed the gun and wrestled with the gunman in the back seat of his car. The driver of the car panicked and attempted to drive off; however, he hit the grey Camry in front of him. Spearman jumped through an open door of the car and ran into the store connected to the gas station. The store's employee gave Spearman a phone and Spearman called the police. In total, five co-conspirators robbed and kidnapped Spearman that night. They allegedly were Corey Brown, Shadarron Evans, Antonio Nicholson, Christopher Johnson, and Torrance McLean.

At Brown's trial, the State called Spearman and two of Brown's co-defendants as witnesses: Nicholson and Evans. Nicholson confirmed both the identity of Brown and Spearman's version of events. However, Nicholson did not know Brown before the incident and initially failed to pick him out of a line-up. Evans testified that he was a friend of Brown's and they participated in the robbery and kidnapping of Spearman. No physical evidence connected Brown to the crime, and Spearman could not initially identify him as one of the robbers.

During his testimony, Evans assured the court and jury that the State did not make him any promises for his cooperation. Rather, he testified that he wanted to tell the truth and correct a false statement he made to law enforcement. This statement was untrue, and the solicitor failed to correct it.

Sometime after trial, Brown's counsel gained access to jailhouse phone call recordings from Evans. By reviewing these records, counsel discovered that the State extended plea offers to Evans and that they engaged in extensive negotiations. Evans was heard saying "people" came to him asking him to testify and "they were trying to give me thirteen years." The State admitted it did not disclose these negotiations because it did not believe the State had made disclosable offers under *Brady*. Brown's counsel filed a post-trial motion for a new trial.

The full extent of the State's discussion with Evans did not come to light until the assistant solicitor testified in the post-trial hearing for a new trial. Initially, the State offered Evans a prison sentence of eighteen years in exchange for testifying. Evans declined this offer and asked the State to offer him ten years. Finally, the parties agreed on thirteen years in exchange for Evans's testimony, but, prior to Brown's trial, Evans breached the agreement because he believed that he could get a better deal. After Brown was convicted and sentenced, the State reduced Evans's original charges from kidnapping and armed robbery to false imprisonment and conspiracy to commit grand larceny. He pled guilty and received a sentence of four years on the conspiracy charge and eight years, suspended to four years, on the false imprisonment charge. The same judge that presided over Brown's trial also sentenced Evans.

At the post-trial hearing, the trial judge expressed his shock and discontent on the record: "I mean, for [the defense] to know he turned down thirteen and decided to start speaking to [the State] to me is a fact that would be important. Because I didn't—and this is the first I'm hearing of it today and so *I'm kind of like wow*."

The court issued an order granting Brown a new trial. In the brief order, the court concluded that "the state initially offered Evans thirteen years. But after meeting with his attorney and a solicitor, Evans believed that, if he testified, the State would present a more favorable offer . . ." The court concluded that the State's failure to disclose this "material evidence" prejudiced Brown.

The State appealed the order granting a new trial, and the court of appeals reversed and remanded the case back to the circuit court to determine if the nondisclosure was material. In so ruling, the court stated:

> We find the [trial] court made no specific findings as to whether the evidence was material to Brown's guilt under *Brady* and likely to have changed the verdict under *Giglio*.[1] . . . Thus, we reverse and remand to the trial court to make specific findings on what basis the court is granting a new trial.

*State v. Brown*, Op. No. 2021-UP-253 (S.C. Ct. App. filed July 7, 2021). The court, finding the *Brady* issue dispositive, declined to rule on the remaining issues raised on appeal. *Id.*

## II. STANDARD OF REVIEW

"The decision whether to grant a new trial rests within the sound discretion of the trial court, and this Court will not disturb the trial court's decision absent an abuse of discretion." *State v. Mercer*, 381 S.C. 149, 166, 672 S.E.2d 556, 565 (2009). "An abuse of discretion occurs when the court's decision is unsupported by the evidence or controlled by an error of law." *State v. King*, 422 S.C. 47, 54, 810 S.E.2d 18, 22 (2017).

## III. DISCUSSION

Brown argues the court of appeals erred in reversing the grant of a new trial because the State admitted that plea offers extended to Evans were not disclosed. As to materiality, Brown contends that the jurors would have decided differently had they known about Evans's avoiding a possible life sentence in exchange for his testimony. Further, Brown maintains the court of appeals ignored the deferential standard of review when reviewing the grant of a new trial.

Conversely, the State first argues it extended only offers to Evans, which were insufficient to require disclosure. Second, the State claims, even if it should have disclosed the information, the testimony was immaterial or "[in]sufficient" to grant a new trial. In support, the State contends Spearman's and Nicholson's testimony rendered Evans's testimony inessential in the case. Further, the State maintains the testimony would not have impacted the outcome at trial.

---

[1] *Giglio v. United States*, 405 U.S. 150 (1972) (holding that, where a witness's testimony is material to a case, the prosecution's failure to disclose a promise not to prosecute made to that witness in exchange for his testimony violates the Due Process Clause of the United States Constitution).

Initially, we note that it is not possible to ignore the trial judge's shock at the discovery of the State's failure to disclose their offer and negotiations with Evans. Contrary to the State's position, the trial judge's reaction evinces impactful materiality. After all, he granted a new trial based on an alleged *Brady* violation. Moreover, a key witness's reliability is always material.

In *Brady v. Maryland*, the United States Supreme Court held, "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. 83, 87 (1963). The Court rationalized its holding to ensure the accused has a fair trial.[2] *Id.*

Almost a decade later, the United States Supreme Court included witness testimony under the reach of *Brady*'s holding: "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [*Brady*'s] general rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). The Court reaffirmed the need to have a finding of materiality under *Brady*. *Id.* ("We do not, however, automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." (internal quotation omitted)). The *Giglio* Court restated the standard of materiality as any reasonable likelihood the testimony could have affected the jury's judgment. *Id.* Moreover, the Court has defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

In *Giglio*, the defense discovered that the prosecution did not disclose a promise made to a key witness in exchange for testimony. 405 U.S. at 150–51. There, the testifying witness was a co-conspirator and the *only* witness linking the defendant to the crime. *Id.* at 151. An affidavit filed by the prosecution as part of

---

[2] Later, the *Bagley* Court observed,

> The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.

*United States v. Bagley*, 473 U.S. 667, 675 (1985) (footnotes omitted).

its opposition to a motion for a new trial confirmed a promise that, if he testified before a grand jury and at trial, he would not be prosecuted. *Id.* at 152. The United States Supreme Court reasoned, "[T]he Government's case depended almost entirely on [the witness's] testimony; without it there could have been no indictment and no evidence to carry the case to the jury." *Id.* at 154. Ultimately, the Court reversed Giglio's conviction on these grounds. *Id.* at 155.

The United States Supreme Court then made certain: "Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule." *Bagley*, 473 U.S. at 676. There, the Court reversed the judgment of the United States Court of Appeals for the Ninth Circuit and remanded the case for a determination regarding materiality. *Id.* at 684. The prosecution promised its witnesses the "possibility of reward" if the information they gave helped convict the defendant. *Id.* at 683. The Court found this gave the witnesses a personal stake in the defendant's conviction and further increased the incentive to testify falsely. *Id.* Importantly, the witnesses were not given firm promises or deals; rather, a mere possibility of favorable treatment was sufficient.

Turning to the elements of the *Brady* test, a claim succeeds when "the evidence at issue is: 1) favorable to the accused; 2) in the possession of or known to the prosecution; 3) suppressed by the prosecution; and 4) material to the defendant's guilt or punishment." *State v. Durant*, 430 S.C. 98, 107, 844 S.E.2d 49, 54 (2020).

The State admitted that there were plea negotiations with Evans and it did not disclose them to the defense before or during trial. Further, the defense properly requested all favorable evidence from the State in a "Rule 5 [*Brady*] Motion." Therefore, we address only the first and fourth elements of the *Brady* test in the context of *Giglio* and *Bagley*.

## A. Nature of the agreement

This case requires the Court to determine whether plea negotiations between the State and a witness need to be disclosed under *Brady*. *See Bagley*, 473 U.S. at 678 ("The constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting cross-examination."). As will be discussed, we conclude that a formal agreement is not always necessary to warrant disclosure. Instead, the analysis must focus on a witness's bias when he or she has a "personal stake" in the conviction. *Id.* at 683.

In *State v. Hinson*, we affirmed the appellant's conviction but remanded the case so that appellant could renew a motion for a new trial before the circuit court. 293 S.C. 406, 361 S.E.2d 120 (1987). Despite the defense's timely *Brady* motion before and during trial, the State did not disclose a promise of immunity made to a witness. *Id.* at 407, 361 S.E.2d at 120. During direct and cross-examination, the witness testified that the State did not promise her anything in exchange for her testimony. In closing argument, the solicitor argued that the witness was testifying voluntarily despite her charges and that there was no agreement for leniency. *Id.* Moments after the jury announced its verdict, the solicitor informed the judge that the witness would not be prosecuted. We concluded "[w]hile the record strongly suggests an undisclosed promise, it does not clearly show that a promise existed." *Id.* at 408, 361 S.E.2d at 121. Importantly, a decision not to prosecute, as we termed it, provided a sufficient basis to justify a remand to determine when the witness knew of the State's decision to treat her favorably.

In *State v. Cain*, we ruled on what *does not* constitute a bargain, agreement, or deal under *Brady*: "The record here contains only a passing reference to a pre-trial statement by the solicitor that he would assist, if possible, in keeping [the witness] from being incarcerated in the same institution as appellant." 297 S.C. 497, 503, 377 S.E.2d 556, 559 (1988). At trial, the State's witness testified that he had not been offered anything in return for his testimony. *Id.* at 502, 377 S.E.2d at 558. We distinguished the case from *Hinson* because there was no evidence that an undisclosed bargain or plea existed. [3] *Id.* at 503, 377 S.E.2d at 559.

Similarly, in *State v. Johnson*, we held no agreement was made concerning the witness's immunity from prosecution. 306 S.C. 119, 124, 410 S.E.2d 547, 551 (1991). Although we summarily concluded the State's witness was material, we agreed there was no evidence an agreement was made. *Id.* Our decision hinged entirely on the former solicitor's testimony that the witness ultimately was not prosecuted because the State's investigation indicated he was not guilty of a crime. [4]

---

[3] Regardless, we also ruled the testimony was not material to the appellant's defense in light of the physical evidence offered at trial. *Id.* at 503–04, 377 S.E.2d at 559 (referring to laboratory tests, bodies found, the crime scene, and the pathologist's testimony).

[4] Breaking from the previous trend, we affirmed the granting of a new trial in *Washington v. State*, 324 S.C. 232, 478 S.E.2d 833 (1996). During its opening argument, the State told the jury that there was no plea agreement with its witness and, further, failed to correct this misstatement during trial. *Id.* at 236, 478 S.E.2d

*Id.* Here, Evans and the State engaged in back-and-forth negotiations. The State initially offered a prison term of eighteen years, and Evans countered with ten. Then, the State offered Evans fifteen years, which Evans rejected. Evans again countered with thirteen years, and the State agreed. However, when it came time for Evans to plead, he refused.

In *Hinson*, we thought it was important to determine when the witness knew that the State would treat her favorably if she testified. In the instant case, Evans knew the State was willing to offer him more if his testimony was satisfactory. Further, the State did not seek violent charges, and the charges against Evans were ultimately reduced to false imprisonment and conspiracy to commit grand larceny. Therefore, unlike the witness in *Hinson*, it is clear that Evans knew of the State's intention to treat him favorably if he testified satisfactorily.

Turning to the reasoning of the court of appeals, in reversing the grant of a new trial, the court first relied on *Tarver v. Hopper*, 169 F.3d 710, 717 (11th Cir. 1999). There, the government stated that no arrangement or deal existed and that only the witness's testimony would be "taken into consideration." *Id.* at 717. We find *Tarver* inapposite because the State engaged Evans with more than offering mere "consideration" of his testimony. The State and Evans had substantial back-and-forth discussions about what it would take for Evans to testify and entered into an agreement to that effect. Therefore, the court of appeals' reliance on *Tarver* is misplaced. The court of appeals relied secondly on *United States v. Rushing*, 388 F.3d 1153 (8th Cir. 2004). There, the witness rejected a plea offer. Here, the witness breached a plea agreement. An offer and an agreement are manifestly different things.

While these two cases seemingly exemplify when plea negotiations are *not* disclosable, we conclude that, here, the negotiations between the State and Evans have a fundamental difference. Evans and the State entered into an agreement when the State accepted Evans's offer to receive a thirteen-year sentence. Evans did not reject an offer as was the situation in *Rushing*. Instead, Evans *breached* the agreement that he had with the State. This does not change the fact that Evans and

at 835. The Court expanded, in a way, the *Giglio* rule to more than the "deliberate deception of a court and jurors": "[T]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* at 235, 478 S.E.2d at 835.

the State made an agreement for Evans to plead guilty in exchange for thirteen years. More importantly, Evans believed that he would get a better deal if he testified favorably, thus giving him incentive to do so. A key reasoning behind *Brady* and its progeny was the disclosure of incentives to give biased testimony.

Based on the foregoing, we conclude that the State and Evans entered into a sufficient agreement. The lack of a written document did not negate the existence of a deal nor the strong evidence of Evans's belief that he would be treated favorably if he cooperated with the State. Having concluded that, under the facts of this case, the plea negotiations between Evans and the State were favorable impeachment evidence, we must next determine whether Evans's testimony was material to Brown's case.

## B. Materiality of non-disclosure

Testimony is material when it could "in any reasonable likelihood have affected the judgment of the jury.'" *Giglio*, 405 U.S. at 154 (quoting *Napue v. Illinois*, 360 U.S. 264, 271 (1959)). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

Initially, we note that in remanding the case for a finding of materiality, the court of appeals seems to ignore the trial court's finding that the failure to disclose the "material evidence" prejudiced Brown.

We believe that Evans's testimony was material and the failure of the State to disclose its negotiations with Evans had a reasonable probability of affecting the outcome of the trial. After Evans negotiated with the solicitor, he was convinced that he could get a better deal if he testified satisfactorily. This supplied the incentive to provide biased testimony. Evans was the only witness to identify Brown in a pretrial police lineup, similarly to the situation in *Giglio*. 405 U.S. at 154 (observing, where the government's case depended almost entirely on one witness's testimony, "without it there could have been . . . no evidence to carry the case to the jury"). In fact, the State did not pursue Brown as a suspect until Evans identified him. Evans had a personal stake in Brown's conviction, as did the witnesses in *Bagley*, when he anticipated leniency on the part of the State and his charges were actually reduced to nonviolent offenses. 473 U.S. at 670, 683 (finding that giving witnesses a personal stake in a conviction, even if not in writing, undermines confidence in the outcome). Additionally, and unlike the case in *Cain*, no physical evidence—such as cell phone records—tied Brown directly or circumstantially to the crime. *Cf. Cain*, 297 S.C. at 503–04, 377 S.E.2d at 559 (finding testimony was not material in light

of physical evidence offered at trial, including laboratory tests, bodies found, the crime scene and the pathologist's testimony).

Therefore, we find there is a reasonable probability the jury would have decided differently if the State's plea negotiations with Evans had been disclosed and Brown had been able to impeach Evans with this information. Under the facts of this case, this was a probability sufficient to undermine confidence in the outcome.[5]

## IV. CONCLUSION

We hold the trial court did not abuse its discretion in granting Brown a new trial. The State had the duty to disclose evidence of the negotiations and deal because Evans and the State formed an agreement before Evans breached that agreement. The State's failure to disclose the negotiations and the accepted offer with Evans deprived Brown of a fair trial because Brown did not have the ability to impeach Evans.[6] Further, there exists a reasonable likelihood the jury would have decided differently had Brown impeached Evans based on the agreement. Therefore, we reverse the court of appeals and remand the case to the circuit court for a new trial in accordance with this opinion.

**REVERSED AND REMANDED.**

**KITTREDGE, FEW, JAMES, JJ., and Acting Justice Kaye G. Hearn, concur.**

---

[5] Brown also relies on *Boone v. Paderick*, 541 F.2d 447 (4th Cir. 1976), and *Tassin v. Cain*, 517 F.3d 770 (5th Cir. 2008), in his arguments. Because we find other case law controlling, we need not address these authorities.

[6] A remark was made at oral argument that solicitors now might begin to ask witnesses during examination if they entered into negotiations or previously accepted a plea offer. We sanction this practice and believe it will properly guard against the appearance of concealing plea negotiations when the witness has an incentive to testify. *See Bagley*, 473 U.S. at 678 ("The constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination.").